UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal Number:** |
| | : | |
| v. | : | **VIOLATION:** |
| | : | 18 U.S.C. § 371 |
| **NEIL G. VOLZ,** | : | (Conspiracy) |
| | : | |
| **Defendant.** | : | |

INFORMATION

The United States charges that:

COUNT ONE

18 U.S.C. § 371 - Conspiracy

INTRODUCTION

Unless specified otherwise, at all relevant times:

1. From in or about January 1995 through in or about February 2002, defendant NEIL G. VOLZ was employed by a Member of the United States House of Representatives ("Representative #1"). From 1995 through in or about 1998, defendant VOLZ served as the Communications Director for Representative #1. From in or about 1998 through February 2002, defendant VOLZ served as Chief of Staff for Representative #1. From in or about January 2001 through February 2002, defendant VOLZ also was employed as Staff Director for a Committee of the House of Representatives for which Representative #1 served as Chairman (the "Committee").

2. From 1994 to 2004, Jack A. Abramoff was a Washington, D.C. lobbyist. Between 1994 and January 2001, Abramoff was employed by a law and lobbying firm ("Firm A"). In January

2001, Abramoff joined a second law and lobbying firm ("Firm B").

3. In July 1999, Abramoff established Capital Athletic Foundation ("CAF"), a private charitable entity for which he sought and received federal tax-exempt status.

4. From March 2000 through 2001, Michael Scanlon worked with Abramoff at Firms A and B as a public relations specialist who provided services to clients throughout the United States. In or about January 2001, Scanlon established his own business to provide grassroots work, public relations services, and election campaign support to his and Abramoff's clients.

5. From January 2001 through July 2002, Tony Rudy worked with Abramoff at Firm B as a lobbyist providing services to clients throughout the United States.

6. In February 2002, defendant VOLZ resigned from the office of Representative #1 and the Committee and joined Abramoff as a lobbyist in the Washington, D.C., office of Firm B.

7. Abramoff, defendant VOLZ, Rudy, Scanlon, and other lobbyists at Firm B represented groups and companies throughout the United States, including Native American tribal governments operating, and interested in operating, gambling casinos. They communicated with their clients by interstate telephone and email and received funds by mail and commercial interstate carrier. For example, Abramoff and Scanlon were hired by a Native American Tribe in Texas ("Texas Tribe #1") to reopen Texas Tribe #1's gaming operations, which had been closed by Texas authorities because Texas Tribe #1 did not have federal or state authority to operate a casino. Abramoff, defendant VOLZ and other lobbyists at Firm B sought to further Texas Tribe #1's interests as well as the interests of their other clients by corruptly influencing public officials, including Members of the United States Congress.

8. At all times relevant to this Information, the Rules of the U.S. House of Representatives:

   a. prohibited gifts, except under limited circumstances, to Members of Congress and staff members of more than $50 at one time, and a total of $100 per year from one source;

   b. prohibited trips paid for by private sources, unless the trip had an official purpose, and prohibited all trips paid for by lobbyists regardless of the purpose;

   c. required that Members of the House and staff members at or above a specified salary threshold file public Annual Financial Disclosure Statements with the Clerk of the House reporting, among other things, (i) all gifts in excess of $285 from any source given to a Representative or staff member during the calendar year; and (ii) all travel and travel-related expenses paid by outside sources totaling more than $285 in that year; and

   d. required that trip disclosure forms contain detailed information about the purpose, cost and sponsor of a trip that was paid for by private entities or persons, and be filed with the Clerk of the House within 30 days after the trip was completed.

## THE CONSPIRACY

9. From 1999 through 2004, in the District of Columbia, and elsewhere, the defendant,

**NEIL G. VOLZ,**

did knowingly conspire and agree with Abramoff, Scanlon, Rudy, and others to commit the following offenses against the United States:

   a. to devise a scheme and artifice to defraud and deprive the citizens of the United States and the United States Congress of the right to the honest services of public

officials, including the right to conscientious, loyal, faithful, disinterested and unbiased service to be performed free of deceit, undue influence, conflict of interest, self-enrichment, self-dealing and concealment, by corruptly accepting, while defendant VOLZ was a public official, and by corruptly offering to public officials, while defendant VOLZ was a lobbyist, a stream of things of value, with the intent to influence and reward official action and agreements to perform official action, all contrary to 18 U.S.C. §§ 1341, 1343, and 1346; and

b. to knowingly make, with the intent to influence, communications to and appearances before Representative #1, employees of the office of Representative #1, and employees of the Committee, within one year of his employment by Representative #1 and the Committee, on matters for which defendant VOLZ was seeking official action on behalf of other persons, contrary to 18 U.S.C. § 207(e).

## PURPOSE OF THE CONSPIRACY

10. The purpose of the conspiracy was for defendant VOLZ and his coconspirators to unjustly enrich themselves by corruptly receiving, while public officials, and providing, while lobbyists, a stream of things of value with the intent to influence and reward official acts and attempting to influence Members of Congress in violation of the law.

## MANNER AND MEANS

11. The conspiracy was carried out through the following manner and means:

a. While defendant VOLZ worked for Representative #1 and the Committee, he received things of value from or at the direction of Abramoff, Rudy and others, including tickets to sporting events, meals and drinks, and golf. During the same

4

    time period, defendant VOLZ, Representative #1, and others performed official acts for or at the behest of Abramoff and others, which were motivated in part by the things of value received.

b.   To conceal the relationship with Abramoff and others, defendant VOLZ failed to disclose, in violation of the Rules of the House of Representatives, various things of value he received from Abramoff and others, which were in excess of the limits established by the House of Representatives.

c.   After leaving government service and joining Abramoff at Firm B in February 2002, defendant VOLZ, Abramoff, Scanlon, Rudy and others would offer and provide things of value to public officials to induce and to ensure favorable official action and other assistance for their clients when needed. In particular, defendant VOLZ, Abramoff and others offered things of value to Representative #1 and members of his staff, including an all-expenses-paid golf trip to Scotland in August 2002; a trip to Lake George, New York, in August 2003; regular food and drink at Abramoff's restaurants; numerous tickets to sporting events and concerts in luxury suites at the MCI Center, Camden Yards Stadium, and FedEx Field; and use of those suites during sporting events and concerts for campaign fund raisers. In exchange for this stream of things of value, Representative #1 agreed to take favorable official action and render other assistance on behalf of the clients of Abramoff and defendant VOLZ.

d.   Within one year of leaving his position as Chief of Staff to Representative #1 and Staff Director to the Committee, defendant VOLZ, with the knowledge and

encouragement of Abramoff and others, communicated with and appeared before Representative #1, employees of the Office of Representative #1, and employees of the Committee with the intent to influence official action.

## OVERT ACTS

In furtherance of the conspiracy and to achieve its purposes, defendant VOLZ, Abramoff and others committed the following overt acts, among others, in the District of Columbia and elsewhere:

12. In January 2000, with Representative #1's knowledge and permission, VOLZ traveled to the Commonwealth of the Northern Mariana Islands with Scanlon and others in part to assist Scanlon and others with their lobbying businesses.

13. On or about October 31, 2000, defendant VOLZ accepted tickets from Abramoff for a Washington Redskins football game in Abramoff's box suite.

14. In or about January 2001, Rudy invited Representative #1 to travel to Tampa, Florida, aboard a private jet for the Super Bowl, though Representative #1 ultimately did not attend.

15. On or about May 10, 2001, defendant VOLZ and Representative #1 met with Abramoff and one of his clients, agreeing to help the client pursue a license to install wireless infrastructure in the buildings of the House of Representatives.

16. Beginning on or about May 21, 2001, defendant VOLZ, with Representative #1's knowledge and permission, solicited and accepted from Rudy four tickets to Abramoff's box suite at the MCI Center for an upcoming U2 Concert, distributing the tickets to himself and others.

17. On or about January 29, 2002, defendant VOLZ emailed Abramoff to advise him that Representative #1 was prepared to send a letter to wireless service providers about a wireless license that a client of Abramoff was pursuing.

18. On or about March 20, 2002, Rudy and Abramoff, after consulting with defendant VOLZ, solicited and received Representative #1's agreement to insert into election reform legislation, during the Conference Committee's consideration of that legislation, an amendment lifting a gaming ban for Texas Tribe #1.

19. In or about April 2002, defendant VOLZ, with the knowledge and encouragement of Abramoff and Rudy, communicated with Representative #1 with the intent to influence him regarding Representative #1's agreement to lift the federal gaming ban affecting Texas Tribe #1. Later, defendant VOLZ also communicated with a member of the staff of the Committee with the same intent.

20. In or about August 2002, Abramoff and defendant VOLZ hosted Representative #1, two members of his staff, and others on an all-expenses-paid trip to Scotland and London by private jet to play golf at the Old Course at St. Andrews and other golf courses.

21. On or about August 8, 2002, Abramoff coordinated with Texas Tribe #1 to cause a $50,000 check from another Native American Tribe in Texas to be sent to CAF by commercial mail carrier to help fund the golf trip to Scotland for Representative #1 and members of his staff.

22. On or about August 14, 2002, defendant VOLZ told Representative #1 what Abramoff wanted him to say in a meeting with representatives of Texas Tribe #1 about his agreement to insert an amendment lifting the gaming ban affecting the tribe.

23. On or about October 8, 2002, defendant VOLZ told Representative #1 what Abramoff wanted him to say in an interstate telephone conference with representatives of Texas Tribe #1 about his agreement to insert an amendment lifting the gaming ban affecting the tribe.

24. Beginning with the restaurant's opening in February 2002 and continuing throughout the end of the conspiracy, defendant VOLZ and Abramoff provided on numerous occasions free drinks and food at Abramoff's restaurant Signatures to Representative #1 and members of his staff.

25. In or about August 2003, defendant VOLZ paid for part of a two-night trip to the Sagamore Resort at Lake George, New York, for Representative #1 and members of his staff. Defendant VOLZ assured Representative #1 that defendant VOLZ would be reimbursed for his payments by Abramoff.

All in violation of Title, 18 United States Code, Section 371.

Dated: May 8, 2006

| | |
|---|---|
| ANDREW C. LOURIE<br>Acting Chief, Public Integrity Section | PAUL E. PELLETIER<br>Acting Chief, Fraud Section |
| Mary K. Butler<br>M. Kendall Day<br>Trial Attorneys<br>Criminal Division<br>U.S. Department of Justice | Guy D. Singer<br>Nathaniel B. Edmonds<br>Trial Attorneys<br>Criminal Division<br>U.S. Department of Justice |