ATTACHMENT A

FACTUAL BASIS FOR THE PLEA
OF NEIL G. VOLZ



CR 06-119
(ESH)
**FILED**
MAY 0 8 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

This statement is submitted to provide a factual basis for my plea of guilty to the conspiracy charge filed against me.

1. Beginning in January 1995, Neil G. Volz ("Volz") was employed by a Member of the United States House of Representatives ("Representative #1"). From 1995 through 1998, Volz served as the Communications Director for Representative #1. From 1998 through February 2002, Volz served as Chief of Staff for Representative #1. When Representative #1 became Chairman of a House Committee (the "Committee") in January 2001, Volz also became Staff Director for the Committee. Volz resigned as Chief of Staff and Staff Director on or about February 6, 2002.

2. From 1994 to 2004, Jack A. Abramoff ("Abramoff") was a Washington, D.C., lobbyist. In 1994, Abramoff joined a law and lobbying firm ("Firm A"). In January 2001, Abramoff joined a second law and lobbying firm ("Firm B").

3. From March 2000 through 2001, Michael Scanlon ("Scanlon") worked for Firms A and B in Washington, D.C., providing public relations services to clients throughout the United States. Scanlon worked on behalf of many clients together with, and at the direction of, Abramoff. Over time, Volz knew that Scanlon also operated his own business providing grass roots and public relations services with Abramoff or his clients called Capital Campaign Strategies ("CCS"), even though Volz was not involved in the negotiations for or performance of CCS's grass roots and public relations services nor did he receive funds from Scanlon directly or indirectly.

1

4.  In January 2001, former Congressional Staffer Tony Rudy ("Rudy") joined Abramoff as a lobbyist at Firm B. In July 2002, Rudy resigned his position at Firm B, leaving to join another lobbying firm in Washington, D.C.

5.  In November 2001, Volz, with Representative #1's knowledge and consent, began to negotiate with Abramoff to join Abramoff as a lobbyist at Firm B. By February 6, 2002, Volz had accepted an employment offer from Firm B, and he began working there on February 20, 2002.

6.  At all relevant times, Abramoff solicited and obtained business with groups and companies throughout the United States, including Native American tribal governments operating, and interested in operating, gambling casinos. Abramoff directly and through his team of lobbyists sought to further his clients' interests by lobbying public officials, including Members of the United States Congress. Typically, Abramoff, Scanlon, Rudy, Volz, and the other lobbyists working with them communicated with the clients and each other by interstate electronic mail, interstate telephone calls, and private or commercial interstate mail carriers. Payments were often made by interstate wire transfer or checks that were mailed or delivered by commercial carrier engaged in interstate commerce.

7.  Beginning in 1997, Abramoff and his coconspirators engaged in a course of conduct through which one or more of them corruptly offered and provided a stream of things of value to public officials with the intent to influence or reward a series of official actions and agreements to perform official action, and public officials corruptly accepted the stream of things of value knowing that they were given with the intent to influence or reward official action. Volz knowingly and voluntarily participated in this scheme first

as a government official receiving things of value and then as a lobbyist providing to public officials things of value with Abramoff and others.

8. The things of value corruptly given to Volz and other public officials included, but were not limited to, repeated travel, golf fees, frequent restaurant meals, entertainment, election support for candidates for government office, and employment for relatives of officials other than Volz. Volz concealed these gifts, which were in excess of the limits established by the House of Representatives, by failing to report them on his annual financial disclosure forms.

9. The official acts and influence, and agreements to provide official action and influence, included, but were not limited to, agreements to garner support for and to support and pass or oppose legislation, agreements to place statements in the Congressional Record, agreements to contact personnel in United States Executive Branch agencies and offices to influence decisions of those agencies and offices, and other actions requested by Abramoff and others.

10. As part of this course of conduct described in paragraphs 7 through 9, from at least as early as January 2000 through April 2004, with Volz's knowledge and assistance, things of value were corruptly offered to and accepted by Representative #1 and members of his staff, including Volz while he was a staffer, including but not limited to the following:

   a. All-expenses-paid trips and reduced-price trips provided by Abramoff, clients of Abramoff, or Abramoff's business interests, including trips to the following locations:

        i.      an August 2002 trip to Scotland and London aboard a private jet to play golf at the Old Course at St. Andrews and other golf courses;

        ii.     a January 2003 trip to the Fiesta Bowl in Tempe, Arizona;

        iii.    a May 2003 trip to New Orleans, Louisiana; and

        iv.    an August 2003 trip to Lake George, New York.

b.    Numerous tickets for entertainment, including concerts and sporting events, as well as frequent golf and related expenses, all in the Washington, D.C. area;

c.    Regular meals and drinks at expensive restaurants in Washington, D.C., including at Abramoff's restaurant Signatures beginning in February 2002;

d.    Repeated, *gratis*, and unreported use of Abramoff's box suites at the MCI Center Arena and Camden Yards Stadium for political fund raisers for Representative #1 and candidates and political organizations he supported.

<u>Volz's and Representative #1's Violation of the Duty to Provide Honest Services</u>

11.    As part of the course of conduct described in paragraphs 7 through 9, beginning at least as early as January 2000 through April 2004, Abramoff and others, including Volz while he was a lobbyist, sought and received Representative #1's agreement and the agreement of his staff, including Volz while he was a staffer, to perform a series of official acts, including, but not limited to, Representative #1's agreement to assist Abramoff in providing services to his clients and to enhance Abramoff's reputation to assist him in securing clients; to assist in stopping legislation against the interests of certain clients and supporting legislation in the interests of certain clients; and to assist in supporting or opposing actions to be taken by other agencies and departments of government.

Representative #1, Volz while he was a staffer, and others agreed to use and did use their official positions and influence, including, but not limited to, the following:

While Volz was a Congressional Staffer

a.  in January 2000, while he was Chief of Staff to Representative #1, Volz, with Representative #1's knowledge and approval, traveled to the Commonwealth of the Northern Mariana Islands ("CNMI") in part to assist Scanlon and others with their lobbying businesses;

b.  in March 2000, Representative #1 agreed to place a statement drafted by Scanlon into the Congressional Record that was critical of the then owner of a boat-based casino business in Florida;

c.  in October 2000, Representative #1 agreed to insert a second statement into the Congressional Record, this time praising the new manager of the boat-based casino business in Florida;

d.  in March 2001, Representative #1 agreed to support legislation which would have permitted manufacturers in the CNMI to attach "Made in the USA" labels to their goods while exempting the manufacturers from compliance with federal labor standards applicable to manufacturers operating inside the fifty states;

e.  on May 10, 2001, Representative #1 and Volz met with Abramoff and one of his clients, agreeing to help the client pursue a license to install wireless infrastructure in the buildings of the House of Representatives. Representative #1, as chairman of the Committee, had the final authority to grant or deny the client's application for the license;

5

### While Volz was a Lobbyist

f.  on March 20, 2002, Representative #1 agreed that, as the Co-Chairman of a Conference Committee of House and Senate Members of Congress, he would introduce and seek passage of legislation that would lift an existing federal ban against commercial gaming by a client of Abramoff and Scanlon in Texas ("Texas Tribe #1");

g.  in July 2002, Representative #1 agreed that, as the Co-Chairman of the previously mentioned Conference Committee of House and Senate Members of Congress, he would introduce and seek passage of legislation that would lift an existing federal ban against commercial gaming for a second Native American Tribe in Texas at Abramoff's request;

h.  in July 2002, Representative #1 agreed to sign a letter opposing the creation of a commission to study Indian gaming. According to an email from Representative #1's Chief of Staff, Representative #1 "wanted to know if anything stronger would be coming out later and he [was] glad to help;"

i.  in or about July of 2002, Representative #1 agreed to assist Abramoff in efforts to obtain property and rights to property from the United States General Services Administration ("GSA") for Abramoff's private school;

j.  on August 14, 2002, after having solicited from defendant VOLZ information about what Abramoff wanted him to say, Representative #1 met with Abramoff and representatives of Texas Tribe #1 and assured Texas Tribe #1 that it was effectively represented by Abramoff and that Representative #1 continued to

        agree to pass Texas Tribe #1's legislation;

k.    in September 2002, Representative #1 met with a Native American Tribal client of Scanlon and Abramoff from California ("California Tribe") and agreed to assist in passing legislation regarding taxation of certain payments received by members of the California Tribe, and to assist in an issue relating to a post office of interest to the California Tribe;

l.    on October 8, 2002, after having solicited from defendant VOLZ information about what Abramoff wanted him to say, Representative #1 participated in an interstate telephone conference call with representatives of Texas Tribe #1 and spoke with them about his agreement to insert an amendment lifting the gaming ban affecting the tribe;

m.    in or about February 2003, Representative #1 agreed to seek support from a Member of another Committee of the House of Representatives for passage of legislation to lift the federal gaming ban for Texas Tribe #1;

n.    in August and September 2003, Representative #1 agreed to co-sign a letter to other Congressmen to garner support for awarding a Congressional Gold Medal to one of Abramoff's most important clients;

o.    at various times, Representative #1 contacted public officials at executive branch agencies and offices on behalf of clients of Abramoff and others in an effort to influence decisions and actions by those officials, including

    i.    in an early 2003 meeting with the Secretary of Housing and Urban Development, in order to assist Abramoff's clients, Representative #1 told

7

        the Secretary that one of Representative #1's priorities would be housing for Native Americans, and

    ii.    in July 2003, Representative #1 agreed to use his office to expedite the application for a travel visa to the United States by a family member of Abramoff's Russian clients.

Volz's Violation of One-Year Lobbying Ban

12. As part of the course of conduct described in paragraphs 7 through 11, beginning in February 2002 and continuing through February 2003, Volz, working with Abramoff, contacted Representative #1, members of Representative #1's staff, and members of the Committee's staff, within one year after Volz left government service in February 2002. Volz and Abramoff intended that Volz communicate with Representative #1, his staff, and the Committee's staff for the purpose of influencing official action on behalf of clients of Abramoff, Volz, Firm B, and others working with them despite the one-year ban that prohibited Volz's lobbying of them, including to influence the following actions:

    a.    beginning in February 2002 and continuing throughout his one-year ban, Volz contacted Representative #1 and a senior staff member of the Committee seeking the endorsement and support of the Committee for a client of Abramoff and Volz to provide wireless telephone infrastructure to the House of Representatives;

    b.    beginning in April 2002, and continuing at various times throughout his one-year ban, Volz contacted Representative #1 and members of his staff and senior members of the Committee's staff to seek official support for legislation to lift a federal gaming ban on behalf of Texas Tribe #1 and another Native American

Indian tribe in Texas. In a later discussion, Volz advised Representative #1 to keep secret from other Members of Congress his agreement to insert legislation on behalf of Texas Tribe #1 in order to avoid angering a Member of the United States Senate opposed to gaming by Texas Tribe #1; and

c. beginning in July 2002 and continuing at various times throughout his one-year ban, Volz contacted Representative #1 to seek support for legislation forcing the GSA to transfer property to a private school operated by Abramoff.

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the conspiracy charge against me. It does not include all of the facts known to me concerning criminal activity in which I and others engaged. I make this statement knowingly and voluntarily and because I am in fact guilty of the crime charged.

DATE: 5/8/06

Neil G. Volz