**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | 1:06cr119 (ESH) |
| : | |
| : | |
| **v.** : | |
| : | |
| **NEIL G. VOLZ,** : | |
| : | |
| **Defendant.** : | |

**UNITED STATES' SUBSTANTIAL ASSISTANCE MEMORANDUM**

In support of the United States' recommendation of a six-level substantial-assistance departure for Neil Volz, the government submits the following.

**I.    INTRODUCTION**

The plea agreement and pre-sentence investigation report set forth in detail the facts underlying Volz's offense and all relevant conduct. What follows is a brief overview of Volz's role within Congressman Robert Ney's and Jack Abramoff's conspiracy to commit honest services fraud, which will provide context and explain Volz's substantial assistance.

A.    Volz's Conduct as a Staff Member for Ney

In 1993, Volz began working for then Ohio state senator Ney as an unpaid intern. Volz was in college at the time. In 1994, Volz worked on Ney's first successful campaign for the U.S. House of Representatives. In 1995, Volz left Ohio State University before completing his degree to move to Washington to work on Ney's congressional staff as his press secretary. In 1998, Volz was named chief of staff for Ney; he was 27 at the time. Volz also met Abramoff in 1998. When Ney became Chairman of the House Administration Committee in January 2001, Ney

1

named Volz the Committee's staff director, a position which Volz held in addition to serving as chief of staff in Ney's personal office.

While a staffer, Volz received fewer things of value from Abramoff and his lobbyists than Ney and other staffers in Ney's office later received. As a staffer, the things of value received by Volz were mostly limited to tickets to several sporting events and a trip to the Commonwealth of the Northern Mariana Islands ("CNMI") in 2000. With Ney's approval Volz went on the trip to advance the lobbying goals of Abramoff and others. Although the trip did include golf and other recreation, Volz and the others on the trip attended meetings with CNMI officials and tour facilities. Also, Volz did not enjoy free meals and drinks with the same regularity as Ney later did when Heaton was his chief of staff, in part because the Ney-Abramoff conspiracy was still developing in 2000 and 2001 and in part because Abramoff did not open Signatures restaurant until after Volz joined Abramoff as a lobbyist.

By far the most lucrative thing of value offered to Volz while he was a staffer was the job he received from Abramoff. Volz began to seriously pursue a job with Abramoff in early November 2001. With Ney's encouragement, Volz accepted a position and joined Greenberg Traurig, LLP, in February 2002. While Volz's base salary did not significantly increase with his employment at Greenberg Traurig, he became eligible for significant bonuses, and Volz enjoyed an expense account which was virtually unlimited. Volz also had the potential to see his future income increase significantly.

As spelled out in the factual basis supporting his guilty plea, Volz began to use his official position to assist Abramoff and his clients in 2000. Like Heaton after him, while Volz was Ney's chief of staff, Ney confided in Volz his concerns about things or the reasons he was

2

taking certain action, but Ney rarely allowed Volz or any other member of his staff to act independently on his behalf in exercising his official power or influence absent Ney's direct involvement. Particularly regarding Ney's relationship with Abramoff and his lobbyists, Volz served mostly as a conduit for the things of value requested by Ney and the official acts requested of Ney. As an active conduit, Volz played a key role in coordinating Ney's insertion of two statements into the <u>Congressional Record</u> in March and October, 2000. Likewise, Volz, at Ney's direction, lent assistance to Abramoff's wireless client in its pursuit of a license from Ney to install wireless equipment in the House of Representatives.

    B.    <u>Volz's Conduct as a Lobbyist for Abramoff</u>

Although Volz attended the 2002 Scotland golf trip with Ney, Heaton, David Safavian, and others, Abramoff and Tony Rudy were the driving forces behind the trip. In May 2002, Rudy invited Ney and Heaton, and Rudy was expected to attend. On July 11, 2002, Rudy announced his resignation from Greenberg Traurig, roughly three weeks before the group's August 3rd departure to Scotland. Volz effectively took Rudy's place, both on the trip and in communicating with Ney and his office, notwithstanding that his one-year lobbying ban did not expire until February 2003. Although Volz had little role in planning the Scotland trip, he served as one of the hosts of the trip. At Abramoff's direction, Volz and another lobbyist covered almost all of the non-prepaid costs for the trip for the public officials, including paying for meals, drinks, golf fees and caddying tips. In consultation with Abramoff, Volz also provided information for the false travel disclosure report Ney filed in connection with the trip.[1]

---

[1] Ney, Heaton, and another staff member were required by the Rules of the House of Representatives to file travel disclosure reports within 30 days of their return from the Scotland golfing trip. Through a clerical error, the reports for Heaton and the other staff member were

Indeed, it was with Abramoff's intense encouragement that Volz began lobbying his old boss and co-workers despite the federal one-year ban against lobbying Ney, his office staff, and the Committee staff. Both during his one-year ban and after it expired in February 2003, Volz spent a great deal of time and money, primarily entertaining his former co-workers and Ney through sporting events, concerts, and dinners and drinks, especially at Signatures.

While a lobbyist, and with Abramoff's approval or direction, Volz also served as the conduit to provide trips from Abramoff to Ney, including to gamble and party in New Orleans in May 2003, and to vacation in Lake George, New York, in August 2003. Volz also occasionally hosted golf in the Washington metropolitan area. Finally, Volz organized fundraisers for Ney at Signatures and in the box suites at sports venues, the in-kind value of which was unreported. After negative press began to appear about Abramoff and Ney, at Ney's request, Volz helped certain Ney staff amend reports. As Ney was aware, the amended reports still under-reported the events which Volz had organized.

Prior to and after the August trip to Scotland in 2002, again at Abramoff's direction, Volz assisted Abramoff in working with David Safavian, then Chief of Staff at the General Services Administration ("GSA"). With Volz and Abramoff, Safavian assisted in a number of areas including (1) attempting to arrange for land controlled by GSA to be made available for use by the private religious school for which Abramoff was the primary benefactor; and (2) trying to obtain the Old Post Office property controlled by GSA for Abramoff and his group of investors to develop into a luxury hotel.

---

either never filed or were lost upon filing. A copy of Ney's report ultimately was filed two years late in September 2004.

Volz's participation in non Abramoff-Ney conspiracies was limited or non-existent. Volz had no awareness of the details of Abramoff's business relationship with Scanlon, nor did he receive any proceeds from their illicit kickback scheme. Nor did Volz have awareness of the details of Ney's relationship with the Foreign Businessman, including the receipt by Ney and Heaton of thousands of dollars in gambling chips and associated proceeds.

In sum, the timing of Volz's entry into the conspiracy and the action taken by him during the conspiracy mean that he was not as culpable as Ney, Abramoff, or certain other members of Abramoff's conspiracies, but he was an important witness to conversations about prior events as well as Ney's motivations for certain actions he took in response to scrutiny of Abramoff's lobbying activities.

## II.    VOLZ'S COOPERATION

On May 8, 2006, Volz pled guilty and admitted participating in a conspiracy to violate his and others' duties of honest services by exchanging things of value for official action both during his time as Ney's chief of staff and later as a lobbyist until April 2004, when Abramoff left Greenberg Traurig.[2] As part of the conspiracy, he also admitted to violating the one-year ban against lobbying his former boss and co-workers and to taking steps to conceal the relationship and the conspiracy in required public disclosure forms.

Taking into account the factors under 18 U.S.C. § 3553(a), Volz's cooperation was timely and substantial. He was one of the first persons to begin to explore cooperating with the

---

[2]Prior to the start of Volz's substantial assistance in February 2006, only Abramoff, Michael Scanlon, and other uncharged witnesses were cooperating in the investigation of Ney. Although Tony Rudy pled guilty prior to Volz, Rudy began cooperating at roughly the same time as Volz's full cooperation began. Volz did everything asked of him by the government in its investigations.

5

government. In April and June 2005, Volz was debriefed on areas agreed to by his lawyers and the government. In February 2006, Volz began providing unlimited cooperation in dozens of debriefings, and his cooperation was substantial especially in connection with the investigation and prosecutions of Congressman Ney, William Heaton, and David Safavian. In addition to his assistance in those three prosecutions, which is described in more detail below, Volz has spent and continues to spend countless hours providing information about other matters under investigation by the Department of Justice, as well as insight into how staff members and lobbyists conduct business before Congress and the Executive Branch. Indeed, Volz has been debriefed about his general and specific knowledge by other investigative agencies on other matters of interest to them. Volz has agreed to continue his cooperation if needed, including in any trial or grand jury testimony.

    A.    <u>Volz's Substantial Assistance in the Prosecution of Congressman Robert Ney and William Heaton</u>

Volz provided information which implicated himself and which was unknown to the government in its investigation of Ney and Heaton. For example, at the time Volz began cooperating, he significantly advanced the government's knowledge and investigation into two additional free and reduced price trips provided to Ney and Heaton, in addition to the Scotland 2002 trip, namely the May 2003 trip to New Orleans and the August 2003 trip to Lake George. Volz also provided information about the two $750 apiece Fiesta Bowl tickets given to Ney in January 2003.

Volz also recounted conversations with Ney wherein Ney had made telling admissions. For example, while on vacation to Lake George in August 2003, Volz remarked to Ney that the Sagamore was a nice resort. Ney responded in substance that Abramoff could afford it. During

one of the meals, Ney asked Volz if Volz was personally paying for items on the trip, and Volz responded that Abramoff would reimburse him for his expenses. Ney responded in substance that this was good, and that Volz should tell Abramoff that the "Chairman" was with Volz.

Additionally, in January 2003, Ney became Chairman of the Financial Services Subcommittee on Housing and Community Opportunity. Although the government had known that Ney had hosted meetings with some of Abramoff's clients regarding housing issues, the government was not aware of all of the lengths to which Ney had gone to be of assistance. Shortly after Ney became chairman of the subcommittee, Volz received a call from Ney recounting a conversation involving Ney and the Secretary of Housing and Urban Development in which Ney announced that Ney's highest priority was Indian housing. Ney told Volz to relay to Abramoff that Ney had laid down this marker during his meeting, but that he was going to need more details from Abramoff. This testimony and other similar episodes would have demonstrated how Ney, on his own initiative, worked to further his corrupt relationship with Abramoff.

Finally, Volz offered detailed information about conversations he had with Ney during and after the press and official scrutiny of Abramoff became a matter of public record. Indeed, Volz endured harsh criticism, including abusive phone calls, from his former friend and mentor, apparently once Ney suspected Volz's cooperation with the government. Volz retained some of the recorded messages and provided them to the government. To the government, it would have been powerful evidence of Ney's consciousness of guilt had Ney elected to fight the charges against him and proceed to trial.

In the government's view, Volz's substantial assistance in the investigation and prosecution of Ney was highly important to the government's ability to successfully prosecute Ney. The government would have been able to successfully prosecute Ney without Heaton's assistance, but not without Volz's. Similarly, Volz's information about additional things of value given to Heaton and official action in which Heaton was involved assuredly helped the government persuade Heaton that he should directly cooperate in the government's investigation. Heaton began directly cooperating approximately 1½ months after Volz pled guilty and his cooperation became public.[3] Heaton gave information corroborating Volz in may important areas.

B. Prosecution of David Safavian in Case No. 05-0370

Volz also provided substantial assistance in the investigation and prosecution of former General Services Administration Chief of Staff David Safavian. Volz was a key witness in the May and June 2006 trial of Safavian, who was convicted by a jury on false statements and obstruction of justice charges concerning Safavian's efforts to conceal his relationship with Abramoff, his assistance to Abramoff in obtaining GSA controlled property, and the nature and costs of the Scotland 2002 trip. Days after Volz's guilty plea was accepted by this Court on May 8, Volz began lengthy preparation for his testimony in the trial of David Safavian before Judge Paul L. Friedman, which began a little more than two weeks later on May 22, 2006.

---

[3]As the Court is well aware, the separation of powers principles enshrined in the U.S. Constitution raise certain complications in a prosecution of a Member of Congress by the executive branch. These complications, including those raised by the Speech or Debate Clause of the U.S. Constitution, mean that testimony and documents corroborating a legislator's corrupt agreement to take official action are crucial to a successful prosecution of a member of Congress.

Prior to his plea, Volz was debriefed about topics related to the Scotland trip, but after his guilty plea, Volz dedicated himself to hours of independent review of written materials, including especially his email communication with Abramoff and his contacts with Safavian. Volz also tracked down bills of other participants on the Scotland trip that he had in his possession and pictures of the events. These pictures and bills were introduced at trial and were important in identifying the total costs of the Scotland trip and the events in which people participated. Additionally, Volz made himself available late into the evenings and over weekends to prepare for his testimony at trial.

Volz's testimony was critical in explaining numerous areas which he directly observed and in which he directly participated - including the corrupt lobbying scheme of Abramoff, Volz's own interactions with Safavian in their efforts to transfer GSA-controlled property to Abramoff, and the details and extravagant nature of the August 2002 golf trip to Scotland and London. Volz explained clearly and in detail how lobbying for Abramoff worked. Volz also detailed the specific legislative and bureaucratic mechanisms that Volz, Safavian, and Abramoff employed in their attempts to transfer control of 50 acres of land in Silver Spring, Maryland, to Abramoff's school as well as his efforts to give a contracting advantage to Abramoff's clients in the redevelopment of the Old Post Office. Volz's testimony also brought to life the August 2002 golf trip, which included smoking cigars, drinking scotch, and golfing at historic Scottish courses. Through Volz, the prosecution introduced evidence of the costs associated with the Scotland trip, the misrepresentation of which formed a large part of the false statements with which Safavian was charged and convicted.

Most importantly, however, Volz's acceptance of responsibility for his own misconduct was unrestrained. He acknowledged his corruption both as a public official and as a lobbyist, and did not attempt to blame others for his own wrongdoing. In the government's view, Volz's testimony during trial, including his testimony under cross-examination, demonstrated to Ney and Heaton that Volz would be an effective witness at a trial on charges against them, and contributed to the decisions of Ney and Heaton to plead guilty.

**III.     GOVERNMENT'S SENTENCING RECOMMENDATION**

As calculated by the Probation Office as well as the parties, Volz's final offense level is 15 before applying any departure for substantial assistance pursuant to Section 5K1.1 of the Sentencing Guidelines. The assistance provided by Volz was more valuable to the government than the assistance rendered by Heaton because it proved substantial in the conviction of David Safavian as well as the investigation and prosecution of Ney and Heaton. Accordingly, the government recommends a six-level departure for substantial assistance, and that a sentence be imposed at the low end of level 9, which is within Zone B of the Guidelines. In accordance with the schedule of punishments established for Zone B sentences in U.S.S.G. § 5C1.1(e)(3), the government recommends home confinement to satisfy any term of incarceration imposed by the Court.

                                **RESPECTFULLY SUBMITTED,**

WILLIAM M. WELCH II
Chief, Public Integrity Section

STEVEN A. TYRRELL
Chief, Fraud Section

  /s/ Mary K. Butler
Mary K. Butler
M. Kendall Day
Nathaniel B. Edmonds
Trial Attorneys
Criminal Division
U.S. Department of Justice
(202) 514-1412
(202) 514-3003 fax

CERTIFICATE OF SERVICE

    I certify that on this 29th day of August, 2007, a copy of the foregoing motion and memorandum in support were delivered to Timothy J. Broas, Esq., and Melissa O'Boyle, Esq., Counsel for Defendant Volz, at TBroas@Winston.com and MOBoyle@Winston.com via the CM/ECF system.

                                                /s/ Mary K. Butler
                                                Mary K. Butler
                                                Trial Attorney