**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 1:06CR119 (ESH) |
| | ) | |
| NEIL G. VOLZ, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT NEIL G. VOLZ'S
<u>MEMORANDUM IN AID OF SENTENCING</u>**

September 5, 2007

WINSTON & STRAWN LLP
Timothy M. Broas, D.C. Bar No. 391145
Melissa E. O'Boyle, D.C. Bar No. 483055
1700 K Street N.W.
Washington, D.C. 20006-3817
Tel: (202) 282-5000
Fax: (202) 282-5100

*Counsel for Neil G. Volz*

# TABLE OF CONTENTS

Page No.

I.      INTRODUCTION ..................................................................................................1

II.     DISCUSSION...................................................................................................8

        A.      Neil Volz's Background ......................................................................9

                1.  Mr. Volz's Childhood In Finneytown, Ohio................................................9

                2.  Mr. Volz's Attendance At The Ohio State University ............................10

                3.  Mr. Volz Meets then-State Senator Robert Ney ......................................11

                4.  Mr. Volz Comes to Washington....................................................11

        B.      The Nature And Circumstances Of the Offense ...........................................13

                1.  Mr. Volz's Service As Chief of Staff & Staff Director ............................13

                2.  Mr. Volz's Decision To Leave Congressman Ney's Office
                    And Work for Jack Abramoff's Team At Greenberg Traurig .................16

                3.  Mr. Volz Served As An Intermediary Between Jack Abramoff
                    And Congressman Ney .......................................................18

        C.      Neil Volz's Character And Rehabilitation.....................................................20

                1.  Cooperation ................................................................20

                    a.  Mr. Volz's Cooperation Was Timely...............................................20

                    b.  Mr. Volz Was The Government's "Star Witness" At The
                        Safavian Trial ...............................................................21

                    c.  Mr. Volz's Guilty Plea, Cooperation And Testimony Placed
                        Substantial Pressure On Congressman Ney And Mr. Heaton
                        to Plead Guilty..............................................................22

                    d.  Mr. Volz's Future Cooperation .....................................................25

                2.  Rehabilitation ................................................................25

## TABLE OF CONTENTS
### (continued)

**Page**

     a.  Mr. Volz Has Taken Full Responsibility For His Actions And Has Reprioritized His Life ........................................................25

     b.  Mr. Volz Should Be Permitted To Continue His Work At U.S. VETS.............................................................................27

D.    There Is No Need To Impose A Sentence Of Incarceration To Deter Criminal Conduct .........................................................29

E.    A Just And Appropriate Sentence Would Not Include A Period Of Incarceration ...............................................................30

III.    CONCLUSION........................................................................31

Defendant Neil G. Volz, by and through counsel, respectfully submits this Memorandum in Aid of Sentencing. In the Government's Substantial Assistance Memorandum ("Government's Memo"), the Government describes Mr. Volz's timely and substantial cooperation, requests a six (6) level reduction in Mr. Volz's offense level and recommends that the Court permit Mr. Volz to serve any period of incarceration in home confinement. Gov. Mem. at 11. Mr. Volz submits the instant memorandum to support further this request for leniency, and to explain how the factors the Court must consider under 18 U.S.C. § 3553(a) weigh against the imposition of any period of incarceration. As discussed below, Mr. Volz's full and complete acceptance of responsibility for his actions, sincere remorse, good character, commitment to rehabilitation, exceptional cooperation, and dedication to public service all weigh in favor of allowing Mr. Volz to remain a productive member of society. Accordingly, Mr. Volz respectfully requests that the Court sentence him to a combination of community service, probation and/or home confinement.

## I.    INTRODUCTION

On May 8, 2006, Mr. Volz pleaded guilty to participating in a conspiracy: (1) to violate his and others' duties to provide honest services; and (2) to violate his one-year ban against lobbying his former boss and co-workers. Mr. Volz now comes before this Honorable Court for sentencing. While considering a just and appropriate sentence, Mr. Volz respectfully requests that this Court take into account the various factors discussed in the instant memorandum.

**Acceptance of Responsibility.** Mr. Volz takes full and complete responsibility for his actions in connection with this conspiracy. Friends and family alike emphasize that Mr. Volz has never once blamed "the system" for his conduct or asserted that he was scapegoated. *See* Ex. 14 (Letter from Vicki Divoll); Ex. 13 (Letter from John Thomas Cook); Ex. 7 (Letter from Elio

M. Betty).  Those whom have heard Mr. Volz speak of his involvement in the Abramoff scandal emphasize the candor with which he recognizes his mistakes and gross errors in judgment.  Ex. 22 (Letter from Jeff Janas); Ex. 61 (Letter from Charles E. Yonkers); Ex. 9 (Letter from Lisa Betty).  Moreover, friends and family describe Mr. Volz as an individual who has been humbled by this experience and is deeply remorseful for his misconduct.  *See* Ex. 2 (Letter from Alison Betty Volz); Ex. 61 (Letter from Charles E. Yonkers); Ex. 51 (Letter from Richard H. Streeter); Ex. 58 (Letter from Dana and Kathy Warren); Ex. 8 (Letter from Judith Betty); Ex. 40 (Letter from John J. Rosati); Ex. 52 (Letter from Hilda M. Tate Riith); Ex. 7 (Letter from Elio M. Betty).

Mr. Volz recognizes that he allowed his friendship with a powerful Congressman and his desire for success in a high-profile lobbying firm to impact his judgment and influence his actions.  Mr. Volz was an idealistic college student when he met then-State Senator Robert Ney.  After working as an unpaid intern in State Senator Ney's legislative office and as a volunteer on Ney's successful congressional campaign, Mr. Volz had such admiration and respect for the newly-elected Congressman that he left college before earning his degree to accept Congressman Ney's job offer in Washington D.C.[1]  Upon arrival in the District of Columbia, Mr. Volz and Congressman Ney not only worked together, but also lived together.  Over the next eight years, Mr. Volz worked closely with Congressman Ney and viewed him as a great friend and mentor.  Congressman Ney, however, also was an extremely difficult and demanding employer and, after Mr. Volz got married, he sought employment opportunities in the private sector.

Before Jack Abramoff became the poster child for political scandal and lobbying reform, he was widely regarded as a highly moral, incredibly successful and respected Republican lobbyist.  In February 2002, Mr. Volz joined Jack Abramoff's lobbying practice at Greenberg

---

[1]  Mr. Volz completed his bachelors degree by taking night and weekend courses at the University of Maryland and correspondence courses at The Ohio State University.

2

Traurig.  Here, Mr. Volz allowed himself to serve as the intermediary between his old boss and his new boss.  Mr. Abramoff wanted Congressman Ney to champion his clients' causes; Congressman Ney enjoyed the lifestyle that Mr. Abramoff could supply and pay for.  Mr. Volz was in the middle and, in this context, he allowed the line between friend and lobbyist to become blurred and ultimately broke the one-year ban.  Mr. Volz gave – and Congressman Ney and his staff accepted – many things of value, and, in return, Congressman Ney advocated for Mr. Abramoff's clients.  Mr. Volz does not blame anyone but himself for his lack of judgment and accepts full and complete responsibility for playing the middleman in this conspiracy.

**Relative Culpability.**  While working for the Congressman, Mr. Volz did accept, on occasion, tickets to sporting events and some free drinks; however, as the Government noted in its Memorandum, Mr. Volz did not receive things of value with the same regularity as Congressman Ney and Mr. Heaton.  Gov. Memo at 2.  Mr. Volz also did not participate in a gambling trip to London, nor did he receive any gambling chips from lobbyists or their clients while working on the Hill.  Although Mr. Volz did accept a trip to the Commonwealth of the Northern Mariana Islands ("CNMI"), this trip had an official business purpose as Mr. Volz attended meetings with CNMI officials and visited textile facilities.  Gov. Mem. at 2.

While working at Greenberg Traurig, Mr. Volz had no involvement in Mr. Abramoff's illegitimate business relationship with Mr. Scanlon, nor did he receive any proceeds from their illicit kickback scheme.  Unlike Mr. Abramoff and many others in his web of co-conspirators, Mr. Volz did not accept any money or property from Mr. Abramoff or Mr. Scanlon.  As the Government noted, "the timing of Volz's entry into the conspiracy and the actions taken by him during the conspiracy mean that he was not as culpable as Ney, Abramoff, or certain other members of Abramoff's conspiracies."  Gov. Memo at 5.

**Timely And Substantial Cooperation.**  As the Government explained, Mr. Volz was one of the first individuals to explore cooperating with the Government in its Abramoff investigation.  Gov. Memo at 5-6.  Mr. Volz responded almost immediately to the Government's request for information by giving his first debriefing on April 27, 2005.  On June 1, 2005, Mr. Volz attended a second debriefing, focusing specifically on the now-infamous Scotland trip that Mr. Volz, Mr. Abramoff, Congressman Ney, Mr. Heaton, and others attended in August 2002.  In the months that followed, the Government and Mr. Volz's counsel negotiated regarding the terms of his continued cooperation, and Mr. Volz proffered new information to the Government through his counsel.   In February 2006, Mr. Volz began providing full debriefings to the Government.  In responding to the Government's questions, Mr. Volz recognized that he was helping the Government build criminal cases against himself and his good friends.  Although this process was painful, Mr. Volz participated in these debriefing sessions because he knew it was a necessary step towards redemption and the right thing to do.

After his guilty plea on May 8, 2006, Mr. Volz's cooperation entered another phase. First, Mr. Volz provided the Government with evidence incriminating others in the conspiracy including, but not limited to, relevant papers, recordings of inflammatory and threatening voicemail messages left by Congressman Ney, and photographs that Mr. Volz had taken during the Scotland trip and other trips.  As the Government noted, the evidence provided by Mr. Volz "would have been powerful evidence of Ney's consciousness of guilt had Ney elected to fight the charges against him and proceed to trial."  Gov. Memo 7.  Additionally, through numerous debriefings, Mr. Volz described the inner-workings of Congressman Ney's office, and provided specific details about the Congressman's corrupt relationship with Mr. Abramoff.  In fact, as the Government explained in its memorandum, while it "would have been able to successfully

4

prosecute Ney without Heaton's assistance," it could not have done so without Mr. Volz's cooperation. *Id.* at 8.

Second, within weeks of his guilty plea, Mr. Volz prepared for and testified on behalf of the Government during David Safavian's criminal trial. Notably, Mr. Volz was the only cooperator to testify at the Safavian trial. As a result, media outlets labeled Mr. Volz the Government's "star witness," and emphasized that Mr. Volz not only gave testimony about Mr. Safavian, but also testified under oath that a sitting Congressmen – Bob Ney – had participated in the illegal conspiracy. *See* Ex. 63 (Associated Press article 5/31/06); Ex. 64 (Fox Special Report 5/30/06 at 6); Ex. 65 (MSNBC Countdown 5/31/06 at 5). As the Government emphasized in its memorandum, "Volz's testimony during trial, including his testimony under cross-examination, demonstrated to Ney and Heaton that Volz would be an effective witness at a trial on charges against them, and contributed to the decisions of Ney and Heaton to plead guilty." Gov. Memo at 10. Indeed, the jury also apparently found Mr. Volz to be a highly credible witness, as Mr. Safavian was convicted on four counts including making false statements to federal officials and obstruction of justice.

Third, Mr. Volz has given dozens of debriefings to various teams of FBI agents and prosecutors. Just last month, Mr. Volz met with the Government at least three times, and he will continue to be available in the future for additional debriefings or to provide testimony. As the Government emphasized in its Memorandum, Mr. Volz has done "everything asked of him by the government in its investigations." Gov. Memo at 5 n.2. In sum, Mr. Volz has substantially assisted the Government's prosecution of Congressman Ney, Mr. Heaton, and David Safavian, and the Government's continuing and ongoing investigation of others.

**Character And Rehabilitation.**  Having accepted responsibility for his misdeeds and with great remorse for his prior actions, Mr. Volz has reprioritized his life and has focused on rehabilitating himself and giving back to the community.  As a result of his illegal actions, Mr. Volz is deeply in debt and has lost, among other things, two lobbying jobs that he loved, his financial security, his reputation, almost all the equity in his home, his federal pension, his and his wife's retirement account, close friends and his right to vote.  Instead of becoming bitter and blaming others for his current situation, Mr. Volz blames only himself and channels all his energy into making things right in his life.

Over the last year, Mr. Volz has served as a pre-school teacher and coached soccer.  *See* Ex. 30 (Letter from Lisa McAuliffe); Ex. 49 (Letter from Emma Stewart); Ex. 50 (Letter from Sholto Stewart); Ex. 47 (Gavin and Tracy Stannard).  Last Fall, at the request of his neighbor Vicki Divoll, Mr. Volz gave a presentation at the U.S. Naval Academy in which he addressed first year midshipmen about the mid-term elections.  *See* Ex. 14 (Letter from Vicki Divoll).  At the end of his presentation, Mr. Volz used his criminal conviction as a cautionary tale to teach the midshipmen an ethics lesson.  *Id.*  Ms. Divoll recalled that the midshipmen were "rapt" with attention while Mr. Volz told them about his criminal case and advised them that, "in their lives, when they see that ethical or legal line up ahead, do not walk toward it." *Id.*  Instead, Mr. Volz advised the college students to "walk away." *Id.*

Rather than dwelling on his own misfortunes and legal problems, Mr. Volz has spent the last year seeking personal redemption by helping others less fortunate than him.  Last October, Mr. Volz started to volunteer with the United States Veterans Initiative ("U.S. VETS"), an organization that helps homeless veterans reintegrate into society.  *See* Ex. 11 (Letter from Stephanie C. Buckley); Ex. 12 (Letter from Emily Button).  Mr. Volz served as a job search

6

mentor one day a week assisting veterans with computer skills, resumes and personal presentation. Ex. 12 (Letter from Emily Button). Mr. Volz also has put the fundraising skills he honed for years on the Hill and as a lobbyist to good use by helping U.S.VETS with fundraising and development. *Id.*

In May 2007, U.S. VETS offered Mr. Volz a full time staff position. Mr. Volz left a better paying job to accept U.S. VETS's offer of employment. Mr. Volz takes his job very seriously and has developed new events and initiatives including an upcoming fundraiser and new classes and programs for the veterans. Ex. 12 (Letter from Emily Button). As the Program Director of U.S. VETS, Emily Button, attests, Mr. Volz "is able to work so well with the veterans because, although he has extraordinary professional skills, he remains humble and takes an attitude of always being ready to learn and to listen." *Id.* Ms. Button further states that "Mr. Volz has made himself indispensable to the work we do in D.C. by his consistent devotion to our program and the veterans." *Id.*

Based on Mr. Volz's acceptance of responsibility, relative culpability, exceptional and valuable cooperation, sincere remorse, good character and rehabilitation, Mr. Volz respectfully submits that a sentence of incarceration is not necessary and will take him away from people far less fortunate than himself who truly need his assistance. Moreover, a sentence of probation may encourage similarly situated former staffers and Abramoff associates to cooperate with prosecutors in the future. For these reasons, discussed in more detail below, Mr. Volz respectfully requests that this Court allow him to continue his rehabilitation and to serve others by sentencing him to community service, probation and/or home confinement.

## II.    DISCUSSION

As the Court is aware, the Plea Agreement stipulates that Mr. Volz's sentencing guideline offense level is fifteen (15).  On August 29, 2007, the Government filed its Motion for a Rule 5K1.1 downward departure.  Based on Mr. Volz's timely and extremely substantial cooperation, the Government suggests a six (6) level departure and a sentence in the "low end" of offense level nine (9).  Gov. Memo at 11.  The Government further recommends home confinement to satisfy any term of incarceration.  *Id.*  In addition to the Government's recommendation, the Court must consider the factors set out under 18 U.S.C. § 3553(a) in determining an appropriate sentence.  *See U.S. v. Booker,* 543 U.S. 220, 125 S. Ct. 738, 160 L.Ed.2d 621 (2005) (noting that Sentencing Guidelines are merely advisory and not binding on the Court, but requiring Court to consider Section 3553(a) factors in determining just and appropriate sentence).

Under Section 3553(a), the Court shall consider, among other things, the following factors in determining a just and appropriate sentence: (1) the history of the defendant; (2) the nature and circumstances of the offense; (3) the character of the defendant; and (4) the need for a just sentence to afford adequate deterrence to criminal conduct.[2]  In weighing these factors, the Court "shall impose a sentence sufficient, but not greater than necessary" to comply with traditional sentencing purposes.   18 U.S.C. § 3553(a).   As discussed below, Mr. Volz respectfully submits that the 3553(a) factors demonstrate that a sufficient and appropriate sentence in this matter should include an alternative to incarceration in the form of community service, probation and/or home confinement.

---

[2]    Section 1335(a) also instructs the Court to determine whether restitution to the victims is necessary.  As the Government explained during the plea hearing and as the Probation Officer noted in the Pre-Sentence Report, restitution is not an issue in this case.

A.    **Neil Volz's Background**

1.    **Mr. Volz's Childhood In Finneytown, Ohio**

Neil Volz was born in Cincinnati, Ohio, on September 1, 1970, and is the youngest child of Gay and Joseph Volz.  Ex. 56 (Letter from Gay and Joseph Volz).  Mr. Volz's brother, Lynn Volz, is two years and nine months older than Mr. Volz.  *Id.*  For the majority of Mr. Volz's childhood, the Volz family lived in an apartment in a small apartment complex in Finneytown, Ohio.  The Volz family is a well-respected, loving, traditional family.

During his childhood, Mr. Volz's father, Joseph, worked as a salesman which required long hours and substantial travel.  *Id.*  To help make ends meet, Joseph and Gay managed the multi-building complex in which the family resided.  This allowed Gay to stay at home with her sons until they were both old enough to attend elementary school.  *Id.*  At that point, Gay returned to work as a middle and high school teacher.  *Id.*  In addition to his immediate family, Mr. Volz formed extremely close bonds with his relatives in the area and throughout Ohio, and his strong relationships with those extended family members remain to this day.  *Id.; see* Ex. 40 (Letter from John J. Rosati); Ex. 34 (Letter from Joseph T. Mullen); Ex. 41 (Letter from Mark and Kimberly Rosati); Ex. 32 (Letter from J. Kelly Mullen); Ex. 38 (Letter from Christopher and Angela Rosati).

As a traditional family, Mr. Volz's parents required both of their sons to be present for family dinners and to attend church.  Ex. 56 (Letter from Gay and Joseph Volz).  Gay and Joseph believed in being firm yet fair with their children. They gave their children responsibilities and chores, but also gave each child the freedom to explore his interests.  Gay and Joseph required the two boys to help around the house and television watching was kept to a bare minimum.  *Id.*  Homework was a group activity.  *Id.*

In addition to school and church, Mr. Volz's young life revolved around Boy Scout trips, sports leagues, reading and friends. *Id.* As his parents recall, Mr. Volz was an active youth and a free spirit. *Id.* Mr. Volz spent almost all of his free time playing with the other children in the neighborhood. *Id.* The Volz family lived in a diverse, multicultural neighborhood, and Mr. Volz got along well with everyone.

In high school, Mr. Volz was very active and a favorite of many of his teachers and classmates. *Id.* Mr. Volz rarely got into trouble; however, he always was quick to accept responsibility when he did something wrong. For example, in Mr. Volz's sophomore year, he admitted to his soccer coach that he had been drinking alcohol at a party even though that meant that he had to sit out of an important soccer game with a cross town rival. *Id.* Although other teammates also were present and drinking, Mr. Volz and his parents had agreed that, as captain of the team, Mr. Volz had a responsibility to be accountable for his actions. *Id.*

Mr. Volz excelled in history and government classes and placed at the top of his class in the advanced placement college preparatory tests. During his time at Finneytown, Mr. Volz was an active member of the community service program, played soccer, was on the wrestling team and participated in theater. His senior year, Mr. Volz's classmates voted him "Best All Around." *Id.*

## 2. Mr. Volz's Attendance At The Ohio State University

After graduating from high school in 1989, Mr. Volz enrolled at The Ohio State University. Mr. Volz tested into the school's Honors Program and excelled in extra-curricular activities. In particular, Mr. Volz enjoyed working on the school newspaper and wrote numerous columns about student life, technology and politics. Mr. Volz also served as an editor and

especially enjoyed working with the professional staff and their robust discussions of current events.

### 3.    Mr. Volz Meets Then-State Senator Robert Ney

In late-1993, Mr. Volz met then-State Senator Robert Ney. An idealistic college student, Mr. Volz began working for Senator Ney as an unpaid intern in his legislative office. Ex. 1 (Letter from Neil Volz). In this role, Mr. Volz answered phones, clipped newspapers and organized the mail. *Id.* At the time, Mr. Volz was so impressed with Senator Ney that he volunteered to work on Ney's congressional campaign. Impressed with Mr. Volz's dedication, then-Senator Ney's staff helped Mr. Volz acquire a paid position with State Senate President Stanley Aronoff's office. *Id.*

State Senator Ney won his election and offered Mr. Volz an opportunity to serve as his press secretary in his Congressional office in Washington D.C. Although Mr. Volz had not yet completed his college degree, because he was so impressed by Congressman Ney, passionate about politics, and excited about the opportunity to serve the public good, he agreed to follow his mentor to Capitol Hill. *Id.*; *see also* Ex. 2 (Letter from Alison Betty Volz). In joining Congressman Ney, Mr. Volz became part of what some have called the 1994 "Republican Revolution."

### 4.    Mr. Volz Comes To Washington

From 1995 until 1998, Mr. Volz served as Congressman Ney's Press Secretary. As a young staffer, Mr. Volz learned from Congressman Ney and others on his staff how to operate on Capitol Hill. Three important factors set the stage for Mr. Volz's future participation in the Abramoff conspiracy. First, during this time, Mr. Volz developed a strong and loyal friendship with Congressman Ney. For his first four years in Washington, Mr. Volz not only worked

closely with Congressman Ney, he also lived with the Congressman. *Id.; see also* Ex. 2 (Letter from Alison Betty Volz). Mr. Volz was a fiercely dedicated, loyal employee who not only worked around the clock, but also socialized regularly with the Congressman. *Id.* In fact, Mr. Volz obtained his bachelors degree by attending classes at the University of Maryland – only in non-election years – so that he could assist Congressman Ney in his reelection campaigns, and he ultimately graduated from Ohio State after completing several correspondence courses. Although Congressman Ney was a demanding and difficult boss, Mr. Volz was intensely loyal to the friend and mentor who had given him the opportunity of a lifetime to work on Capitol Hill. *Id.*

Second, Congressman Ney came to Washington D.C. in 1995 with the so-called "Republican Revolution," during which mid-term elections resulted in Republicans gaining majority control in both the House of Representatives and the Senate for the first time since 1952. At this time, the leaders of the new Republican majority were looking to entrench themselves as the majority party for years to come, and the now-infamous "K Street Project" was born. Created by Grover Norquist and supported by the powerful Majority Whip Tom DeLay, the K Street Project sought to turn "the capital's 'lobbying community' into a Republican auxiliary, by pressuring lobbying firms and trade associations to support a broad conservative agenda, hire only Republicans, and give money overwhelmingly to Republican politicians." *See* Ex. 66 (The New Yorker article 1/16/06); Ex. 67 (Washington Post article 1/4/06); Ex. 68 (Washington Post article 12/29/05); Ex. 69 (Associated Press article 2/1/06); Ex. 70 (The New Republic article 4/10/06). By all accounts, the K Street Project was highly successful in establishing relationships between Republican lobbyists and Republican politicians. *Id.* This is the context and environment in which Mr. Volz learned the tools of his trade.

12

Third, Mr. Volz did not receive any formal ethics training when he worked on Capitol Hill.  Without any well-established guidance, Mr. Volz was left to navigate his own way through the political machinery and ethical temptations on Capitol Hill.  And where, as Congressman Ney's Chief of Staff, Mr. Volz crossed the line.

### B.    The Nature And Circumstances Of The Offense

As explained in the factual basis for his plea agreement, Mr. Volz participated in the Abramoff conspiracy by:  (1) violating his duty to provide honest services and causing others to violate their duties to provide honest services; and (2) violating his one-year ban against lobbying his former boss and co-workers.  Mr. Volz fully admits his participation in this conspiracy and sincerely regrets his wrongful actions and lack of judgment.  Mr. Volz, however, is a good person who placed his faith in the wrong people and allowed his judgment to be compromised by his ambition and by two mentors both driven by power and greed.  Below, Mr. Volz outlines various factors that distinguish his conduct from those more culpable in the conspiracy.  Mr. Volz offers this information to provide some context surrounding the nature and circumstances of his offense, and does not in any way suggest that any of these factors serve as an excuse for his wrongful conduct.

### 1.    Mr. Volz's Service As Chief Of Staff & Staff Director

Mr. Volz served as Congressman Ney's Chief of Staff from late 1998 until January 2002.  Mr. Volz, at twenty-seven (27), was one of the youngest Chiefs of Staff on Capitol Hill at the time.  In January 2001, Congressman Ney became Chairman of the House Administration Committee, and named Mr. Volz to the position of Staff Director to the Committee.  At the end of his tenure on the Hill, Mr. Volz violated his duty to provide honest services; however, several special circumstances exist that make Mr. Volz less culpable than others in the conspiracy.

First, as the Government noted in its Memorandum, Mr. Volz accepted some tickets to sporting events and some free drinks, but not with substantial frequency.  Gov. Memo at 2. Moreover, unlike the now-infamous 2002 Scotland trip, Mr. Volz's trip to the CNMI mixed official business with pleasure.  *Id.*  During the trip, Mr. Volz toured all three islands that make up the CNMI to learn the country's history and its infrastructure needs, visited textile facilities to learn about the industry that dominates the CNMI's economy and participated in meetings with CNMI officials.  Mr. Volz also had no involvement while he was on or off the Hill with Congressman Ney's and Mr. Heaton's trip to London and acceptance of gambling chips.  *Id.* at 5.

Second, Mr. Volz allowed his loyalty to his friend and boss and his sincere desire to help Congressman Ney rise through the ranks of the Republican leadership to severely compromise his better judgment.  While serving as Congressman Ney's press secretary, Mr. Volz learned from the Congressman and others that the quickest way to obtain power in the House of Representatives was to get Congressman DeLay's attention through fundraising for the Republican party and its candidates.  Ex. 1 (Letter from Neil Volz).  Congressman Ney had expressed his desire to form a relationship with Mr. Abramoff because of Mr. Abramoff's reputation as a substantial fundraiser and his reported relationship with Congressman DeLay.  *Id.* As a result, when Mr. Abramoff's team, lead by former DeLay staffer Mike Scanlon, approached Congressman Ney about placing items in the *Congressional Record* on behalf of a Florida businessman, Mr. Volz did not question Congressman Ney about the propriety of submitting statements that had nothing to do with his Congressional district in the record.  Instead, against his better judgment, Mr. Volz served as the conduit between Mr. Abramoff's team and Congressman Ney, and supported the relationship between Congressman Ney and his benefactor. *Id.*  In complying with the wishes of his boss, Mr. Volz ignored his conscience and crossed an

ethical and legal line.  Although misguided and wrong, Mr. Volz's actions were not done to benefit himself, but to support the goals and wishes of his boss, mentor and friend.  *Id.*

Finally, although tainted by his misdeeds, Mr. Volz's eight-year career on Capitol Hill was not just about free trips, tickets and drinks, but genuine public service and dedication to this country and its citizens.  As individuals he worked with during this time recall, Mr. Volz came to Capitol Hill with the goal of making a difference in people's lives.  Ex. 26 (Letter from Maura Keefe); Ex. 31 (Letter from Michael F. McGarey); Ex. 52 (Letter from Hilda M. Tate Riith); Ex. 37 (Letter from John Poe); Ex. 27 (Letter from Philip G. Kiko).  Co-workers recall Mr. Volz's exemplary work ethic and tireless dedication to working for the American people.  *Id.*  Indeed, one co-worker recalls being impressed with Mr. Volz's dedication to the American people, labeling Mr. Volz as someone "who found personal satisfaction in being a noble public servant."  Ex. 22 (Letter from Jeff Janas).

Channing Nuss, a staff member of the Committee on House Administration, served with Mr. Volz and recalls that his "hard work, creativity, and keen grasp of organizational management provided an invaluable contribution toward effectively managing the House."  Ex. 35 (Letter from Channing J. Nuss).  Mr. Nuss also emphasized that Mr. Volz placed his own personal safety aside during September 11, 2001 to remain at the U.S. Capitol Police Headquarters to help facilitate the evacuation of members and their staffs, and to help organize House Members' return to the Capitol at the end of the day to demonstrate American strength, unity and resolve.  *Id.*; *see also* Ex. 22 (Letter from Jeff Janas).  Another co-worker, Jeff Janas, recalled that, in response to the anthrax attacks on the Hill, Mr. Volz "toiled around the clock to ensure that everyone who worked in the House of Representatives was safe from additional threats while also keeping the House open and functioning."  Ex. 22 (Letter from Jeff Janas).

15

In sum, although serious episodic lapses in judgment will forever taint Mr. Volz's tenure on Capitol Hill, those close to him recall an eight-year career marked by his sincere dedication to serving the American people, his tireless efforts to ensure that Congress was open and functioning during times of unprecedented national crisis, and his willingness to place others' safety before his own.

### 2.    Mr. Volz's Decision To Leave Congressman Ney's Office And Work For Jack Abramoff's Team At Greenberg Traurig

As explained in the factual basis for Mr. Volz's plea, Mr. Volz violated his duty to provide honest services by accepting Mr. Abramoff's offer of employment at the Greenberg Traurig law firm. Although it does not excuse his conduct, there were two additional, important factors that impacted this decision to leave the Congressman's office and join Mr. Abramoff's firm. To begin, Congressman Ney was an extremely difficult and demanding boss who required Mr. Volz always to put him first above other friends and family. Ex. 1 (Letter from Neil Volz); Ex. 2 (Letter from Alison Betty Volz). Although Mr. Volz and Congressman Ney were friends, the Congressman was the dominant and domineering force in the relationship. Congressman Ney expected Mr. Volz to be "on call" at all times, and required Mr. Volz to follow his instructions without questions or conditions. *Id.* Since 1995, Congressman Ney had been the center of Mr. Volz's professional and, frankly, social world. In 2000, this changed when Mr. Volz got married and decided that his wife and his family should come first. *Id.* After this shift in priorities, Mr. Volz decided to pursue other employment opportunities. And, with Congressman Ney's blessing and encouragement, Mr. Volz accepted Mr. Abramoff's offer to work as a lobbyist at Greenberg Traurig. *Id.*

Mr. Volz joined Mr. Abramoff's lobbying practice at Greenberg Traurig without knowing the full extent of Mr. Abramoff's greed and corruption. Although Jack Abramoff's

16

name is now synonymous with greed and corruption, in 2001 and early 2002 when Mr. Volz joined Greenberg Traurig, Mr. Abramoff was a well-respected, highly successful lobbyist.  *See* Ex. 68 (Washington Post article 12/29/05).  In July 2000, the Wall Street Journal published two articles about Mr. Abramoff's successful lobbying practice and his close relationship with Congressman Tom DeLay.  *See* Exs. 71-72 (Wall Street Journal articles 7/3/00 & 7/18/00). Later that year, the Washington Post reported that Jack Abramoff may defect from Preston Gates Ellis & Rouvelas Meeds and take with him a "substantial book of business – bigger than whole lobbying practices at some substantial law firms."  Ex. 73 (Washington Post article 11/30/00). The Washington Post article further explained that Mr. Abramoff's connections with House Majority Whip Tom DeLay and other Republican leaders would make him particularly attractive to other lobbying firms.  *See id.;* Ex. 74 (Roll Call article 12/18/00 labeling Mr. Abramoff a "close ally of House Majority Whip Tom DeLay"); *cf.* Ex. 75 (National Journal article 2/26/05) (describing Mr. Abramoff's and Representative DeLay's relationship); Ex. 76 (Time article 4/17/05) (noting that Representative DeLay once referred to Abramoff as "one of my closest and dearest friends").   The media reports were consistent with Mr. Abramoff's reputation in the industry – a reputation that remained steadfast after he transferred his team to Greenberg Traurig. Ex. 77 (New York Times article 4/3/02).  With the benefit of hindsight, it is clear now that Mr. Volz replaced one corrupt boss with another.  However, prior to his downfall, Mr. Abramoff was a well-respected lobbyist with connections to the most powerful Republicans on the Hill, and Mr. Volz simply was not aware of the extent of Mr. Abramoff's corrupt nature.

### 3. Mr. Volz Served As An Intermediary Between Jack Abramoff And Congressman Ney

As Mr. Volz admitted in his plea hearing, working in the private sector for the first time in his post-college career, he: (1) violated the one-year ban by lobbying Congressman Ney and his staff; and (2) caused Congressman Ney and Mr. Heaton to violate their duties of honest services by providing free tickets, drinks and trips. Mr. Volz respectfully submits, however, that there are special circumstances that distinguish his conduct from others more culpable in the conspiracy and which warrant leniency.

First, Mr. Volz received no formal training on the Hill or in private practice regarding what the one-year lobbying ban permitted or prohibited. Before leaving his job on Capitol Hill, Mr. Volz talked to the Staff Director of the House Ethics Committee about the parameters of the one-year ban. In substance, Mr. Volz was informed that he could still socialize with Congressman Ney and his staff as long as he did not have the "intent to influence them." Mr. Volz, who is not a lawyer, did not receive any additional formal ethics training when he arrived at Greenberg Traurig.

Although Mr. Volz initially had good intentions to comply with the ban, he slowly veered off course and ultimately ignored the ban altogether. Although the one-year ban sounds like a simple prohibition in principle, in practice Mr. Volz had a difficult time determining where the line of friendship ended and lobbying began. For eight years, Mr. Volz's primary social group centered around Congressman Ney and his staff. Like most staffers, Mr. Volz was a self-described "political junkie" who loved to debate politics, and as Chief of Staff, Mr. Volz, Congressman Ney and other staff members would spend hours discussing and debating the political issues of the day. Ex. 1 (Letter from Neil Volz). As Chief of Staff, Mr. Volz could freely participate in conversations about politics; however, as a lobbyist, Mr. Volz was

prohibited from discussing political issues important to his clients with Congressman Ney and his staff for at least one year. In this context, Mr. Volz allowed the line between friend and lobbyist to blur as he did not restrain himself when conversations focused on topics important to his clients. *Id.* Although Mr. Volz initially attempted to limit his professional involvement with Congressman Ney and his staff to scheduling meetings and obtaining updates on legislation, he eventually ignored his conscience and followed Mr. Abramoff's instructions to lobby his former boss despite the one-year ban.

Second, while at Greenberg Traurig, Mr. Volz's primary involvement in this conspiracy was to serve as the subservient middleman between his current boss and his former boss. Mr. Abramoff wanted Congressman Ney to serve as a "champion" for his clients; in return, Congressman Ney enjoyed the lifestyle and campaign contributions that Mr. Abramoff could provide. In the middle of these two powerful and corrupt men stood Mr. Volz, whose goals were to please both his new boss and his former boss and to succeed as a lobbyist. Ignoring his better judgment and his conscience, Mr. Volz allowed himself to be used by both men for their own illicit purposes and participated in furthering the corrupt scheme. *Id.* Although Mr. Volz assisted in the conspiracy by providing many things of value to Congressman Ney and his staff, he was neither the mastermind nor the primary beneficiary.

Third, Mr. Volz did not participate in and did not profit from Mr. Abramoff's and Mr. Scanlon's illicit kickback scheme. Simply put, Mr. Volz did not participate in or profit from the sphere of conduct involving Mr. Scanlon's and Mr. Abramoff's "Gimme Five" scheme aimed at defrauding Mr. Abramoff's clients. *See* Ex. 78 (Time Article 7/4/05). In fact, Mr. Volz began to understand the full extent of the dishonest business relationship between Mr. Abramoff and Mr. Scanlon after reading the February 22, 2004 Washington Post article by Susan Schmidt which

broke the story about Mr. Abramoff's and Mr. Scanlon's scheme to defraud Mr. Abramoff's clients. Ex. 1 (Letter from Neil Volz); Ex. 89 (Washington Post article 2/22/04). Within two weeks of the Washington Post article, Mr. Abramoff left Greenberg Traurig. Mr. Abramoff asked Mr. Volz to go with him to his next lobbying firm. Mr. Volz, however, told Mr. Abramoff that he would not be following the once-revered lobbyist to the next firm. *See* Ex. 1 (Letter from Neil Volz).

In sum, all of the factors discussed above demonstrate that Mr. Volz is a good person who placed his faith and loyalty in corrupt people, failed to listen to his conscience and chose the wrong path. Mr. Volz, however, is not the type of hardened criminal whose conduct merits a sentence of incarceration.

### C.    Neil Volz's Character And Rehabilitation

Pursuant to 18 U.S.C. § 3553(a), the Court must consider the character and nature of the defendant in determining a just and appropriate sentence. In the paragraphs above, Mr. Volz has described his dedication to public service, his desire to be a good and loyal friend to his mentor and boss, and his willingness to place others' safety before his own. An analysis of Mr. Volz's character, however, would be incomplete if it did not consider his timely and substantial cooperation with the Government and the extraordinary steps he has taken to reshape and rehabilitate his life.

### 1.    Cooperation

### a.    Mr. Volz's Cooperation Was Timely

As the Government explained, Mr. Volz was one of the first individuals to explore cooperating with the Government in its Abramoff investigation. Gov. Memo at 5-6. Mr. Volz responded almost immediately to the Government's request for information by giving his first

debriefing on April 27, 2005.  Then, on June 1, 2005, Mr. Volz answered the Government's questions regarding the now-infamous 2002 Scotland trip that Mr. Volz, Mr. Abramoff, Congressman Ney, Mr. Heaton and others attended in August 2002.  After this second proffer session, the lawyers discussed terms of further cooperation for many months, and Mr. Volz responded to the Government's requests for information through his attorneys.  In February 2006, Mr. Volz began providing full debriefings to the Government.  Although the process of disclosing incriminating information about himself, his friends and his mentor for over a decade was extremely difficult, Mr. Volz participated in these debriefing sessions because he knew he had to take responsibility for his actions and do the right thing.

After Mr. Volz pleaded guilty, he provided the Government with tangible evidence incriminating others in the conspiracy including, but not limited to, relevant papers, recordings of inflammatory and threatening voicemail messages left by Congressman Ney, and photographs that Mr. Volz had taken during the Scotland trip and other trips.  As the Government emphasized in its memorandum, Mr. Volz's evidence "would have been powerful evidence of Ney's consciousness of guilt had Ney elected to fight the charges against him and proceed to trial." Gov. Memo at 7.

     **b.**     **Mr. Volz Was The Government's "Star Witness" At The Safavian Trial**

On May 8, 2006, Mr. Volz pleaded guilty to one count of conspiracy.  As the Government noted in its memorandum, immediately after pleading guilty, Mr. Volz started preparing to testify as a Government witness in the trial of David Safavian.  Gov. Memo at 8. David Safavian, the former Chief of Staff of the General Services Administration, was tried and convicted on charges of obstruction of justice and making false statements to federal officials

about the extent of his professional relationship with Mr. Abramoff and about the 2002 golf trip to Scotland that he took with Mr. Abramoff and others.

On May 30, 2006, Mr. Volz spent an entire day on the witness stand.  Mr. Volz was the only cooperating witness to testify at the Safavian trial.  At the trial, Mr. Volz gave the jury an insider's view into the high-powered world of politics and lobbying.  In particular, Mr. Volz was the only Government witness with first-hand knowledge of Mr. Safavian's significant professional relationship with Mr. Abramoff which was the principle foundation for the false statement charges.  Mr. Volz also described, in painstaking detail, the 2002 Scotland trip including the substantial costs of the trip, the daily itineraries, the private jet that took the party to Scotland and London, the $400 rounds of golf, the $500 hotel rooms, the dinners, the cigars, the scotch and the complete lack of any official activities.  While Mr. Volz's verbal description of the trip painted a picture for the jury, Mr. Volz's photographs of the misadventure brought the Scotland trip to life right before their very eyes.  Through Mr. Volz, the Government was able to show the jury photographs of the travelers standing in front of their private jet, sitting inside the private jet, and David Safavian and others golfing on the famed "Old Course" in Scotland.  After his testimony, the media characterized Mr. Volz as the Government's "star" or "key" witness. *See* Ex. 63 (Associated Press article 5/31/06); Ex. 79 (Associated Press article 5/30/06); Ex. 64 (Fox Special Report 5/30/06 at 6); Ex. 65 (MSNBC Countdown 5/31/06 at 5); Ex. 80 (Roll Call article 6/12/06).

> **c.    Mr. Volz's Guilty Plea, Cooperation And Testimony Placed Substantial Pressure On Congressman Ney And Mr. Heaton To Plead Guilty**

Mr. Volz's guilty plea, cooperation and trial testimony apparently placed an enormous amount of public pressure on Mr. Heaton and Congressman Ney to come to terms with their

criminal conduct. Although Mr. Volz's trial testimony focused principally on the conduct of

defendant David Safavian, he also testified under oath in open court that he recently had pleaded

guilty to conspiracy and named a sitting Congressman – Bob Ney – as one of his co-conspirators.

In addition to this incriminating testimony, Mr. Volz further identified Congressman Ney as a

lawmaker who championed Mr. Abramoff's causes, and he described in great detail

Congressman Ney's and Mr. Heaton's participation in the 2002 Scotland trip and explained their

preparation of false travel disclosure forms. In short, Mr. Volz's testimony at the Safavian trial

lifted the veil of secrecy surrounding "Team Ney" and, for the first time, publicly exposed the

extent of Congressman Ney's corruption. *See* Ex. 81 (NPR 5/31/06 noting that "Ney wasn't on

trial, but his name just kept coming up."). This point was not lost on the media, nor, for sure, on

Congressman Ney or Mr. Heaton.

News reports following Mr. Volz's testimony raised the stakes for Congressman Ney by

uniformly questioning the legality of Ney's conduct. Ex. 82 (New York Times article 5/31/06);

Ex. 81 (NPR 5/31/06); Ex. 83 (Columbus Dispatch article 6/4/06); Ex. 62 (Washington Post

article 5/31/06). In fact, one outlet reported that media reports of Mr. Volz's testimony had so

enraged Congressman Ney that he e-mailed a Copley News Reporter to state that he was "sick of

[the reporter's] crap" and threatened to take out an advertisement criticizing the reporter's ethics.

Ex. 84 (Copley News article 6/8/06); Ex. 80 (Roll Call article 6/12/06). It is apparent that Mr.

Volz's truthful testimony in the Safavian trial damaged Congressman Ney's credibility

significantly and placed an enormous amount of public pressure on the campaigning

Congressman.

On June 20, 2006, a federal jury convicted Mr. Safavian of lying to federal investigators

and obstruction. The day after the verdict, the Columbus Dispatch stated that the guilty verdict

demonstrated that "the jury believed Volz's story." Ex. 85 (Columbus Dispatch article 6/21/06). On News Hour With Jim Lehrer, Sabrina Eaton from the Cleveland Plain Dealer commented as follows:

> Volz was one of the star witnesses against Safavian. And if the government decides to press any charges against Ney, Neil Volz seems like he would be a likely person to testify against Ney, too. And, obviously, the jury determined that Volz was a credible enough witness that, you know, they did find Safavian guilty.

Ex. 86 (NewsHour With Jim Lehrer 6/20/06 at 6-8). Stating similar sentiments, the Washington Post reported that the conviction "bolsters the credibility of Neil Volz as a witness" and is "another building block in the case against Ney." Ex. 87 (Washington Post article 6/21/06); *see also* Ex. 88 (Grand Rapid Press article 6/25/06) (noting that "[i]t remains to be seen whether Volz becomes a devastating witness against his old congressional boss."). Mr. Safavian's conviction sent a clear and unequivocal message to Congressman Ney and Mr. Heaton – Mr. Volz is a credible, believable cooperating witness. As the Government noted in its Memorandum, "Volz's testimony during trial, including his testimony under cross-examination, demonstrated to Ney and Heaton that Volz would be an effective witness at a trial on charges against them, and contributed to the decisions of Ney and Heaton to plead guilty." Gov. Memo at 10.

In sum, Mr. Volz pleaded guilty on May 8, 2006 and testified at the Safavian trial on May 30, 2006. As the Government states in its Memorandum, Mr. Heaton commenced his full cooperation immediately thereafter in June 2006. On October 13, 2006, Congressman Ney pleaded guilty to conspiracy, followed by Mr. Heaton's guilty plea on February 26, 2007. In sum, Mr. Volz's guilty plea, cooperation and testimony at the Safavian trial caused Congressman Ney's house of cards to crumble. As the Government explained, it "would have been able to

24

successfully prosecute Ney without Heaton's assistance, but not without Volz's." Gov. Memo at 8.

### d. Mr. Volz's Future Cooperation

Since his guilty plea, Mr. Volz has given dozens of debriefings to various teams of FBI agents and prosecutors regarding a multitude of topics and individuals. As the Government emphasized in its Memorandum, Mr. Volz has done "everything asked of him by the government in its investigations." Gov. Memo at 5 n.2. Just last month, Mr. Volz met with the Government at least three times, and he will continue to be available in the future for additional debriefings or to provide grand jury or trial testimony. A sentence of incarceration only will frustrate the Government's ability to continue to meet with Mr. Volz at their convenience.

Through his exceptional cooperation and testimony, Mr. Volz has demonstrated his sincere remorse for his conduct and his intense desire to remedy the harm that he has inflicted. In light of these considerations, Mr. Volz respectfully submits that a period of incarceration is not warranted in his case.

### 2. Rehabilitation

### a. Mr. Volz Has Taken Full Responsibility For His Actions And Has Reprioritized His Life

Although Mr. Volz engaged in bad acts and made gross errors in judgment, he is a good person who has reprioritized his life to walk a narrow path and seek redemption for his misdeeds. Those who know him paint a picture of an honorable yet humbled man who focuses every day on rehabilitating his life and giving back to the community.

Mr. Volz has taken full and complete responsibility for his actions. Friends and family alike emphasize that Mr. Volz has never once blamed "the system" for his conduct or asserted that he was scapegoated. *See* Ex. 14 (Letter from Vicki Divoll); Ex. 13 (Letter from John

Thomas Cook); Ex. 7 (Letter from Elio M. Betty). Those whom have heard Mr. Volz speak of his involvement in the Abramoff scandal emphasize the candor with which he recognizes his mistakes and gross errors in judgment. Ex. 22 (Letter from Jeff Janas); Ex. 61 (Letter from Charles E. Yonkers); Ex. 9 (Letter from Lisa Betty). Moreover, friends and family describe Mr. Volz as an individual who has been humbled by this experience and is deeply remorseful for his misconduct. *See* Ex. 61 (Letter from Charles E. Yonkers); Ex. 51 (Letter from Richard H. Streeter); Ex. 58 (Letter from Dana and Kathy Warren); Ex. 8 (Letter from Judith Betty); Ex. 40 (Letter from John J. Rosati); Ex. 52 (Letter from Hilda M. Tate Riith); Ex. 7 (Letter from Elio M. Betty).

Over the last year, Mr. Volz has concentrated on supporting his family and giving back to the community. Mr. Volz's family members describe his unyielding devotion to his immediate and extended family. Ex. 57 (Letter from Lynn J. Volz); Ex. 40 (Letter from John J. Rosati); Ex. 5 (Letter from Alicia Betty); Ex. 7 (Letter from Elio M. Betty); Ex. 34 (Letter from Joseph T. Mullen); Ex. 41 (Letter from Mark and Kimberly Rosati); Ex. 32 (Letter from J. Kelly Mullen); Ex. 39 (Letter from Gerri and Jack Rosati); Ex. 38 (Letter from Christopher and Angela Rosati). Over the last year, Mr. Volz has served as a substitute pre-school teacher and coached youth soccer. *See* Ex. 30 (Letter from Lisa McAuliffe); Ex. 61 (Letter from Charles E. Yonkers); Ex. 49 (Letter from Emma Stewart); Ex. 50 (Letter from Sholto Stewart); Ex. 46 (Letter from Granville and Susan Smith); Ex. 47 (Gavin and Tracy Stannard). Despite knowing about Mr. Volz's legal situation, the Director of the pre-school was impressed with Mr. Volz's "gentle easy way with the children" and emphasized that Mr. Volz's "manners, style, and fun sense of humor make him a terrific role model." Ex. 30 (Letter from Lisa McAuliffe). Ms. McAuliffe's sentiments are echoed by other friends and family who note with great appreciation Mr. Volz's

sincere kindness and caring attitude towards children. *See* Ex. 46 (Granville and Susan Smith); Ex. 5 (Letter from Alicia Betty); Ex. 49 (Letter from Emma Stewart); Ex. 50 (Letter from Sholto Stewart); Ex. 41 (Letter from Mark and Kimberly Rosati).

Last Fall, Mr. Volz's neighbor, Vicki Divoll, asked Mr. Volz to give a presentation to her American Government and Constitutional Development class of first-year midshipmen at the U.S. Naval Academy. *See* Ex. 14 (Letter from Vicki Divoll). Ms. Divoll asked Mr. Volz to speak to the midshipmen about the mid-term elections, and she inquired whether Mr. Volz would be "willing to talk about his criminal conviction as a 'cautionary tale' to the plebes." *Id.* After Ms. Divoll got approval, Mr. Volz gave his presentation. As requested, at the end of his presentation, Mr. Volz described his criminal conviction to teach the midshipmen an ethics lesson. Ms. Divoll recalled that the midshipmen were "rapt" with attention while Mr. Volz told them about his criminal case and advised the young men and women that, "in their lives, when they see that ethical or legal line up ahead, do not walk toward it." *Id.* Instead, Mr. Volz advised the college students to "walk away." *Id.*

In sum, as is reflected by the letters from the people who know him, Mr. Volz is not simply paying lip service regarding his remorse and contrition. Mr. Volz's sentiments are real, and are reflected in his daily actions.

> **b.     Mr. Volz Should Be Permitted To Continue His Work At U.S. VETS**

Mr. Volz has taken substantial steps towards rehabilitating himself and becoming a good citizen. Mr. Volz has spent the last year helping others less fortunate than him: homeless veterans. In an attempt to realign his moral compass and to return to public service, last October, Mr. Volz started to volunteer with the United States Veterans Initiative ("U.S. VETS"), an organization that helps homeless veterans reintegrate into society. *See* Ex. 11 (Letter from

27

Stephanie Buckley); Ex. 12 (Letter from Emily Button).  Mr. Volz served as a job search mentor one day a week assisting veterans with computer skills, resumes and personal presentation. Putting the fundraising skills he learned on the Hill to work for an honorable purpose, Mr. Volz has helped U.S.VETS with fundraising and development.  *Id.*  His direct supervisor, Stephanie Buckley, labels Mr. Volz "one of the organization's strongest leaders" and notes that "[h]is caring nature and sincere investment in everything he does also help him excel in working with the homeless veteran population we serve."  Ex. 11 (Letter from Stephanie C. Buckley).

In May 2007, U.S. VETS offered Mr. Volz a full-time staff position.  Despite his mounting debts and financial despair, Mr. Volz left a higher paying job to accept U.S. VETS's offer of employment.  Since joining U.S. VETS, Mr. Volz has developed new events and initiatives, including an upcoming fundraiser and new classes and programs for the veterans.  As the Program Director of U.S. VETS, Emily Button, attests, Mr. Volz "is able to work so well with the veterans because, although he has extraordinary professional skills, he remains humble and takes an attitude of always being ready to learn and to listen."  Ex. 12 (Letter from Emily Button).  Ms. Button further states that "Mr. Volz has made himself indispensable to the work we do in D.C. by his consistent devotion to our program and the veterans."  *Id.*  The Pre-Sentence Report notes that Ms. Buckley explained that the veterans have benefited from Mr. Volz's work "immeasurably," and noted that Mr. Volz has chosen to deal with a personal "bad situation" in a positive manner. Ex. 11 (Letter from Stephanie C. Buckley).

As Ms. Buckley perceptively points out in her letter, Mr. Volz is a shining example to the homeless veterans of what an individual can do with second chances.  Ex. 11 (Letter from Stephanie C. Buckley).  Mr. Volz respectfully submits that a period of incarceration would take

him away from people far less fortunate than himself who truly need his assistance.  Mr. Volz asks this Court for a second chance.

### D.    There Is No Need To Impose A Sentence Of Incarceration To Deter Criminal Conduct

Because of the media coverage of this and related cases, there is no need for the Court to sentence Mr. Volz to a period of incarceration to deter future conduct.  Mr. Volz's case is a cautionary tale of what happens when one violates the public's trust by ignoring one's conscience and allowing oneself to be motivated by ambition and manipulated by bosses who value only power and greed.  Politicians, staff and lobbyists are all familiar with the Abramoff scandal and Mr. Volz's role in it.  Moreover, they are aware that, as a result of his misdeeds, Mr. Volz was publicly disgraced, is deeply in debt, and has lost his professional reputation, two lobbying jobs that he loved, his financial security, almost all the equity in his house, his federal pension, his and his wife's retirement fund, close friends, and his right to vote.  Mr. Volz's life will never be the same, and his story already serves as a deterrent for those similarly situated.

But Mr. Volz's story did not end with his guilty plea.  Through his testimony in the Safavian trial, Mr. Volz was the first cooperator to describe the Abramoff conspiracy in public. Politicians, staff and lobbyists are aware of the exceptional assistance that Mr. Volz has provided to the Department of Justice in connection with the Abramoff investigation.  A period of incarceration may discourage similarly situated former staffers and Abramoff associates from cooperating with prosecutors in the future.  However, an alternative sentence may encourage other staffers and associates to come forward and cooperate with the Government to ensure that justice is done.   Accordingly, a period of incarceration for Mr. Volz is not necessary to deter future misconduct.

29

**E.    A Just And Appropriate Sentence Would Not Include A Period Of Incarceration**

As discussed above, Mr. Volz already has suffered severe punishment through, among other things, his public disgrace, the destruction of his professional reputation, and the complete loss of financial security.  And, although he knows he has a long way to go, Mr. Volz is attempting to repay his debt to society by doing good works in the community.  In light of the facts discussed above, including his good character, extraordinary cooperation and steps toward rehabilitation, Mr. Volz respectfully requests that the Court follow the Government's recommendation and sentence Mr. Volz to community service, probation and/or home detention.

If the Court orders Mr. Volz to pay a fine, he respectfully requests that the Court consider three facts in determining the amount of such a fine.  First, in his Pre-Sentence Report, the Probation Office specifically concluded that Mr. Volz does not have the ability to pay a fine. Second, Mr. Volz's job with U.S. VETS, while personally and professionally rewarding, only pays $952 bi-weekly.  Third, Mr. Volz has significant legal debts.  In light of these factors, Mr. Volz humbly echoes the Probation Office's suggestion and asks that, in lieu of a fine, the Court order Mr. Volz to do community service.

30

III.    **CONCLUSION**

As discussed above, Mr. Volz is a good and decent person who followed Congressman Ney and Mr. Abramoff down a dishonorable and destructive path.  However, Mr. Volz is trying to make amends and to remedy the mistakes of the past by cooperating with the Government and dedicating his life to his wife, family and community.  As a result, Mr. Volz respectfully submits that a period of incarceration is not justified in this case and requests that the Court sentence him to community service, probation and/or home detention.


Dated:  September 5, 2007                    Respectfully submitted,

                                             Neil G. Volz


                                             By: /s/Timothy M. Broas_____
                                             WINSTON & STRAWN LLP
                                             Timothy M. Broas, D.C. Bar No. 391145
                                             Melissa E. O'Boyle, D.C. Bar No. 483055
                                             1700 K Street N.W.
                                             Washington, D.C.  20006-3817
                                             Tel:  (202) 282-5000
                                             Fax:  (202) 282-5100

CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of September, 2007, a copy of the foregoing Memorandum in Aid of Sentencing was delivered to Mary K. Butler, Esq. and M. Kendall Day, Esq., Trial Attorneys, Public Integrity Section, Criminal Division at Mary.K.Butler@usdoj.gov and M.Kendall.Day@usdoj.gov via the CM/ECF system.


By: /s/Timothy M. Broas
Timothy M. Broas