**List of Exhibits**
**to Defendant's Memorandum in Aid of Sentencing**

*United States v. Neil G. Volz*
*Case No. 06-cr-119 (ESH)*

Letters to the Court from:

1. Neil G. Volz
2. Alison Betty Volz
3. Colleen Aylward, M.P.P.
4. Stacy E. Beck
5. Alicia Lane Betty, Esq.
6. Elio Betty
7. Elio M. Betty
8. Judith Betty
9. Lisa Betty
10. Inga C. Blast
11. Stephanie C. Buckley, M.S.
12. Emily Button
13. John Thomas Cook
14. Vicki Divoll
15. Shane Elkin
16. Paul Frick
17. Lisa Garfinkel
18. Maureen and Greg Hamilton
19. Donald E. Hoffman
20. Peter Hong
21. Kahle Jackett
22. Jeff Janas
23. Stewart M. Jervis
24. Matthew R. Jezior, M.D.
25. Melissa Jezior
26. Maura Keefe
27. Philip G. Kiko
28. Steven L. Kreseski
29. Richard Lupoletti
30. Lisa McAuliffe
31. Michael F. McGarey
32. J. Kelly Mullen
33. John W. Mullen
34. Joseph T. Mullen
35. Channing J. Nuss
36. Brigham Pierce
37. John Poe
38. Christopher M. and Angela Z. Rosati
39. Gerri and Jack Rosati

40. John J. Rosati
41. Mark and Kimberly Rosati
42. Dori Rubin
43. Howard W. Sabrin
44. Rebecca Salay
45. Christopher B. Smith
46. Granville and Susan Smith
47. Gavin and Tracy Stannard
48. Carl Stewart
49. Emma Stewart
50. Sholto Stewart
51. Richard H. Streeter
52. Hilda M. Tate Riith
53. Jeffrey L. Taylor
54. David and Erin Thornton
55. Christopher Veillette
56. Gay and Joseph Volz
57. Lynn J. Volz
58. Dana and Kathy Warren
59. Robert D. Warren
60. Rochelle Wertenteil
61. Charles E. Yonkers

Articles:

62. Susan Schmidt, *Former Ney Aide Details How Abramoff Treated 'Champions,'* THE WASHINGTON POST, May 31, 2006, at A07
63. Michael J. Sniffen, *Ethics Officers May Testify in Lobby Case,* ASSOCIATED PRESS ONLINE, May 31, 2006
64. *Fox Special Report with Brit Hume* (Fox television broadcast May 30, 2006)
65. *Countdown* (MSNBC television broadcast May 31, 2006)
66. Hendrik Hertzberg, *Abramoffed; Hendrik Hertzberg on an unfolding Washington scandal,* THE NEW YORKER, Jan. 16, 2006, at 25
67. Jeffrey H. Birnbaum & Dan Balz, *Case Bringing New Scrutiny To a System and a Profession*, THE WASHINGTON POST, Jan. 4, 2006, at A01
68. Susan Schmidt & James V. Grimaldi, *The Fast Rise and Steep Fall of Jack Abramoff; How a Well-Connected Lobbyist Became the Center of a Far-Reaching Corruption Scandal*, THE WASHINGTON POST, Dec. 29, 2005, at A01
69. Nancy Benac, *Scandal Increases Scrutiny of K Street,* ASSOCIATED PRESS ONLINE, Feb. 1, 2006
70. *Money for Nothing*, THE NEW REPUBLIC, Apr. 10, 2006, at 7
71. Jim VandeHei, *Rain Dance: Mississippi's Choctaw Find an Unlikely Ally In a GOP Stalwart – Lobbyist Takes Hefty Fees, Antitax Spin to Save Tribe's Lucrative Perks – A Break for the Marianas*, THE WALL STREET JOURNAL, July 3, 2000, at A1
72. Jim VandeHei, *Garment-Making Haven Saipan Looks to GOP Lobbyist*, THE WALL STREET JOURNAL, July 18, 2000, at A24

73. Judy Sarasohn, *Abramoff and Team Likely to Jump Ship*, THE WASHINGTON POST, Nov. 30, 2000, at A35
74. Ed Henry, *Heard on the Hill*, ROLL CALL, Dec. 18, 2000
75. Peter H. Stone, *Abramoff's and DeLay's Foreign Adventures*, THE NATIONAL JOURNAL, Feb. 26, 2005
76. Karen Tumulty et al., *When Tom Met Jack; Inside the cozy relationship between Tom DeLay and D.C.'s most notorious lobbyist. Could it take the leader down*, TIME MAGAZINE, Apr. 25, 2005, at 23
77. David E. Rosenbaum, *At $500 an Hour, Lobbyist's Influence Rises with G.O.P.*, THE NEW YORK TIMES, Apr. 3, 2002, at 1
78. Massimo Calabresi, *The Gimme-Five Game*, TIME MAGAZINE, July 4, 2005, at 30
79. Michael J. Sniffen, *Former Lobbyist Testifies Against Official*, ASSOCIATED PRESS ONLINE, May 30, 2006
80. Mary Ann Akers, *Heard on the Hill*, ROLL CALL, June 12, 2006
81. *Morning Edition: Ney Chief of Staff Takes Stand at Safavian Trial*, (NPR Broadcast May 31, 2006)
82. Philip Shenon, *Ex-Aide Tells of Understating Cost of Trip*, THE NEW YORK TIMES, May 31, 2006, at 17
83. Jonathan Riskind, *Testimony offers a glimpse into lobbyists' greedy hunt for influence*, THE COLUMBUS DISPATCH, June 4, 2006, at 05B
84. George E. Condon Jr., *Under pressure, Ney lashes out at press coverage*, COPLEY NEWS SERVICE, June 8, 2006
85. Jonathan Riskind & Jack Torry, *Conviction bad news for Ney; Ex-aide helped win case against former official, aiding probe of lawmaker*, THE COLUMBUS DISPATCH, June 21, 2006, at 1B
86. *The NewsHour with Jim Lehrer: Two Abducted U.S. Soldiers Found Dead in Iraq* (PBS television broadcast June 20, 2006)
87. Jeffrey H. Birnbaum, *Ex-Aide to Bush Found Guilty; Safavian Lied in Abramoff Scandal*, THE WASHINGTON POST, June 21, 2006, at A01
88. *Conviction sends message to Congress; Lawmakers wonder who is next to fall after Abramoff scandal*, GRAND RAPIDS PRESS (Mich.), June 25, 2006, at A6
89. Susan Schmidt, *A Jackpot From Indian Gaming Tribes; Lobbying, PR Firms Paid $45 Million Over 3 Years*, THE WASHINGTON POST, Feb. 22, 2004, at A01

# EXHIBIT 1

September 5, 2007

The Honorable Judge Ellen S. Huvelle, U.S.D.J.
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Huvelle:

It is with great regret that my actions have made it necessary to write this letter to you. I am deeply sorry for my criminal behavior and wish to apologize from the bottom of my heart to our country, which you represent, and which I let down.

I am sorry to my family and my friends who have inherited this ordeal through no fault of their own. Very simply, my mistakes have disappointed us all. I accept full and total responsibility for my decisions and will carry the shame of my conviction with me for the rest of my life. It should have been so much different.

The first time I met Bob Ney was in his State Senate office. I was an unpaid college intern. He was the powerful Ohio Senate Finance Committee Chairman, responsible for funding the annual state budget. My job was to clip newspapers, answer phones and run errands. One day he sat down next to me at a table as I feverishly cut up newspapers with a pair of scissors. Suddenly self conscious about the mess I had made, I started cleaning it up. Bob quickly put me at ease.

Bob told me my actions were crucial, quickly explaining how answering the phones and clipping the papers kept him in touch with the voters. He convinced me I was important. I'll never forget that moment. With those simple words, I was hooked. Believing in Bob and his party, I volunteered for Bob's congressional campaign. He won his race and offered me a job as a press secretary, starting immediately. Still in college, I knew this type of opportunity did not come around every day. I was excited about working on Capitol Hill and about working for Bob Ney in particular.

Moving to Washington after the elections of 1994 was a dream come true. Feeling like a lottery winner at every turn, it seemed as if I was falling upstairs.

Coming to Washington, Bob was not just a boss and an inspiration, he became my good friend. Living with the Congressman was awkward at first, but over time Ney World became a fraternity I would soon call home. Not knowing too many people in a new city, the staff leaned on each other for support and took guidance from a man we affectionately called "Cong." In the early years, Bob was every bit the fun-loving, open and a hard-working public servant people said he was. Bob aimed to please everyone, constituents and staff alike. At the same time, he was an ambitious politician who encouraged the same in us.

My job was everything. Whenever the Congressman needed someone in the office, I was there. No errand was too small. No project too big. Those initial years were euphoric. The Republicans had won the majority in the House of Representatives for the first time in forty years and it felt historic. I was a true believer; committed to a movement that was making a difference. As our campaign literature said, we were working hard to make lives better.

I was Bob Ney's Press Secretary for nearly four years. When I was promoted to Chief of Staff, things slowly began to change. The job ushered me into a whole new world. Gone was our cheerful and optimistic leader. In his place was a man whose ambitions knew no bounds and whose private rage would erupt on a moment's notice. Despite warnings about what to expect from my predecessor, I was unprepared for this new dynamic. It was the beginning of life in a house divided; separated by the friend who would regale all comers over drinks with stories about the good old days in the Ohio legislature, and the man whose darker angels would preoccupy much of my time.

One night early on in my tenure as the Congressman's top staffer, he and I joined several constituents for dinner and drinks at a local restaurant. As we discussed a few important local projects, one of them made a negative and unsubstantiated comment about a staff member in our office. The remark stuck with Mr. Ney through the rest of the night. After hours of laughter and political talk, when it was finally just the two of us, the Congressman exploded in anger. He demanded that I fire the staffer immediately. Her sin? She appeared more loyal to a senior staffer than Mr. Ney himself. Not knowing what else to do, I suggested we sleep on it. After all, it was past midnight by that point. But the Congressman would have none of it. He called her immediately and fired her on the spot.

Hours after watching one of our best employees get dismissed; I was awakened the next morning by an angry phone call from the Congressman. "If you had fired her like I told you to, we could have undone all of this," Ney yelled incessantly. "Now, because I did it myself, we can't," he concluded as if he was somehow teaching me a lesson. Sadly, looking back, he was. Even worse, I was listening. Instead of confronting the Congressman's corrosive approach to staff, I worked around it, viewing his behavior as some sort of management challenge to overcome.

The work itself, however, provided me solace as the Congressman's accomplishments became mine as well. I felt like our efforts were meaningful. Whether it was helping protect the many steel and coal towns of Eastern Ohio or throwing every bit of my soul into Mr. Ney's goal of becoming the first full committee chairman of his class, our collective ambition made it easier for me to balance between the Congressman's duplicitous personality.

With that being said, please know it would be many years before I would even begin to question my devout belief that the "good Bob Ney" was the real one. He had given me so much. Unlike other Members of Congress, Mr. Ney spent a lot of time with

2

his staff. The many late nights together provided me unparalleled access to the inner working of the House of Representatives, and I was grateful. In addition, the Congressman showered those of us in his good graces with once in a lifetime opportunities like visiting the President at the White House, touring the Pentagon, taking trips all over the world or meeting influential people.

As my loyalty grew so did my willingness to rationalize away behavior I knew was wrong. To avoid confrontation, I did not ask questions when I should have and heard what I wanted to hear. Of course, one thing Mr. Ney made sure I heard was the importance of Congressman Tom DeLay to our efforts at securing a Congressional Chairmanship. At that point in time, in 1999, the hard-charging Majority Whip was the most influential Member of the House of Representatives. We spent hours upon hours cultivating ties with his office and those close to him.

Mr. Ney knew Mr. DeLay to be a close friend and important fundraiser for Mr. DeLay and other Republicans. He also knew Mr. Abramoff employed some of the Majority Whip's former staff. The Congressman made a priority of improving his relationship with them as well. Therefore, when a member of Mr. Abramoff's team, former DeLay staffer Mike Scanlon, approached the office about placing items in the Congressional Record that did not pertain to Ohio's 18th Congressional District, I did not question Mr. Ney's willingness to do as they asked. By not asking questions and ignoring my conscience, I crossed the line. Those decisions were mine and I am responsible for them.

Though misguided and wrong, I desperately wanted to help the man who had given me the chance of a lifetime. In retrospect, too much of my time was given to the foolish endeavor of trying to keep Congressman Ney happy. Frankly, he didn't deserve it.

Your Honor, I tell you this to show I have learned from my experience, not to justify my actions. After all, there is no justification for my involvement in this conspiracy. Jack Abramoff and Bob Ney didn't put a gun to my head and demand that I travel with them to Scotland. Nor did some mythical Washington culture somehow suspend my responsibility to behave legally. I made my own decisions and accept the consequences for them.

When Alison and I were married in 2000, I promised her things would be different. A better future was within reach. Despite my trepidations about leaving the Congressman's office, Alison and I decided, during our August 2001 honeymoon, that it was time to move on.

Initially, working for Team Abramoff appeared to be the perfect fit. Bob instantly saw the benefit in me joining Greenberg Traurig and encouraged the transition when I told him of the possibility. At the time, it seemed to verify my belief that having the powerful Mr. Abramoff as my new boss would provide cover from the abuse other

3

former Ney staffers had been forced to confront, as their priorities inevitably drifted away from those of the Congressman.

In my mind, a short-term professional disengagement from Mr. Ney's office was a necessary beginning to the plan. From there, I would hopefully join the small handful of former staff who had successfully navigated their way to a place where they were able to enjoy Bob's company on their own terms – without any of the daily emotional upheaval.

In the meantime, Jack said all the right things. During one of our first dinners together at Signatures, I mentioned that I wanted to reduce the amount of time I spent wining and dining. Mr. Abramoff, who didn't drink, told me "we are a family here, and I want to make things easier for all of our families."

The first few weeks were fantastic, but it quickly changed. Rather than making things better, my decision to join Mr. Abramoff's lobbying team ultimately made things worse—much worse.

At first, I took steps to ensure my compliance with the law requiring a one-year cooling-off period for Congressional staff. In doing so, I avoided certain meetings and conversations in order to meet what I believed to be the ban's requirements. When my colleague at Greenberg Traurig who worked as a liaison with the Ney office during those initial months left the firm, however, the pressure mounted from both the Congressman and Mr. Abramoff for me to fill the void.

While the intent of the one-year ban law is obvious, there were numerous moments when it seemed less than clear. Since the Ney staff was comprised of some of my very best friends, I saw them socially all the time. As we had for years, we rigorously debated politics and public policy, often discussing legislation we had worked on together and to which I was deeply committed. Over time, however, instead of continuing to adhere to the ban, I became exactly the bridge the Congressman and Mr. Abramoff wanted.

At that time, I ignored the red flags in front of me as I enjoyed the benefits of facilitating the Abramoff/Ney relationship, just as they benefited from my role as liaison. When the Congressman wanted to travel or celebrate, Team Abramoff, myself included, was there to help. Becoming someone I am not, I allowed the free trips, drinks, meals and tickets to misdirect my moral compass.

Instead of letting my ethics guide me or having the courage to discuss my concern with others, I let ambition, fear and ego trump doing the right thing. My actions were wrong. Loyalty is undoubtedly good, but blind loyalty is still blind. Not a day goes by that I don't wish I could undo those decisions.

My world began to change when the *Washington Post* broke the story of Mr. Abramoff's and Mr. Scanlon's business dealings in early 2004. I learned a lot from the

4

early reporting. For the first time in years, I took a good long look at myself. Cutting through the clutter, I methodically started working to get back on the straight and narrow.

After he was fired days after the first Post story, Mr. Abramoff began interviewing with several firms around town interested in hiring the team. While numerous others followed, I quickly told him to count me out. At the same time, I began building a practice that limited my professional involvement with Congressman Ney's office. It seemed like dramatic change back then. In reality, though, these changes were nothing more than small steps in the right direction.

When Senator McCain's staff contacted me to talk about the relationship between Mr. Abramoff and Mr. Ney in late 2004, it was my first real moment of clarity. Though my soul searching had already begun, I knew life-defining decisions would soon be required.

Within weeks of talking with the Department of Justice, I quickly understood setting things right would probably mean sacrificing my job, my identity, many of my friends, my economic security, putting an unbearable burden on my family and possibly cost me my freedom. I was scared. Though not sure where it would lead, I knew I was finally doing the right thing.

It was during this time when my relationship with Bob Ney fundamentally changed. One night in spring 2005 I met the Congressman and a few others for dinner at a restaurant downtown. Something was up. While the rest of the group was at the bar, Mr. Ney pulled me aside. Looking around, he started talking to me about the Scotland trip. I told him I could not discuss it with him. Still, he wouldn't stop.

Finally, the Congressman exploded in a profanity-laced tirade threatening me, my job and my future. As his staff quickly escorted him out of the restaurant, he continued the rant. Bob pointed at me in front of his whole entourage and declared me *persona non grata*, i.e., cut off.

As his car whisked off, Mr. Ney called me on my cell phone and a screaming match ensued. Ten years of my life flashed before my eyes. I hung up on him and remembered thinking that would be the last time I ever talk to him again. Then he called my wife Alison at our house and continued his verbal onslaught. Despite our hurt feelings, the whole episode only strengthened my resolve. I was going to do the right thing, tell the truth to the Government and let the chips fall where they may.

Unlike my decision to break the law, I am proud of my decision to cooperate with federal prosecutors and investigators. Helping law enforcement allows me to undo some of the damage I have caused. It also assists in my personal rehabilitation. The investigation is far from over, and I look forward to continuing to help.

It has been almost two years since I lost my job after being named "staffer B" in Jack Abramoff's plea agreement, and nearly three and a half years since the scandal

began. During that time, much has happened. My life is different now and the scars are deep, but I am working hard to make things right.

I am supported by a wonderful family and friends I know to be true. Alison and I have become closer. We share our life more now and she makes my experiences real. My parents are also more a part of my life. From them, I have learned the power of dreams, hard work and making a difference. I have also been shown the value of unconditional love. Many aren't so lucky.

For much of the last year, I have had the privilege of helping the United States Veterans Initiative provide care, support and shelter to former service members struggling to get back on their feet. Most of the veterans have endured unimaginable trauma in their lives, whether on the battlefield or in the streets. Together, we cling to the promise of second chances. Each one of them has helped to make me a better man in their own individual way. I can only hope I have helped them half as much as they have helped me.

Success has a different meaning to me now. Handing keys to a person who hasn't slept in a bed for months is a reminder that we are all in this together. Watching someone get a job, re-connect with family or move into a new apartment renews my faith in discipline, never giving up and knowing you get out of something what you put in. Fear of change and trusting that you can really get back on your feet is common at the Ignatia House. In that, the vets are not alone.

Your Honor, I have a very real understanding of my failures. I broke the law, I am sorry and it will never happen again. As you consider my wrongdoings, please know they are an aberration of my true character. I am not a bad person. I am a good person who lost his way, a good man whose misjudgments and misplaced priorities have cost me and my family dearly, destroying much of what I have just begun to repair.

I believe deeply in people's ability to make a difference, whether it is a national movement of millions or a handful of driven, caring individuals. In my travels from student to Congressional staffer to lobbyist, I lost sight of that. Even as I wish it was possible to turn back the clock, I know the past cannot be undone. Still, I believe we can make life better. That is my goal, my life's mission. I hope you can see I am trying.

Sincerely,

Neil Volz
3907 Northampton Street, N.W.
Washington, DC 20015

6

# EXHIBIT 2

*Alison Betty Volz*

September 5, 2007

The Honorable Judge Ellen S. Huvelle, U.S.D.J.
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Huvelle:

I have known Neil for more than 12 years and have been his wife for the past seven. I'd like to share with you my account of my husband's situation and wrongdoings, why I believe he made such poor decisions and broke the law, our experiences since he pleaded guilty last May and the changes I have seen in him since then.

Neil and I met in July 1995, only a few months after he moved to Washington. Hired directly out of college with no time to finish his studies at Ohio State, Neil moved in a hurry to take a job as Congressman Ney's Press Secretary at the age of 24. My roommate at the time was a childhood friend of Neil's. He would visit our house often. He was smart, funny, eager and enthusiastic about his new job and his new boss. Neil described Congressman Ney as the "real deal," a straight shooter whose priorities were the welfare of his constituents and his commitment to public service.

Even though I was impressed with and surprised by the fact that he was already a press secretary for a U.S. Member of Congress, Neil's command of public policy was extraordinary. As was his passion for politics. He didn't want to study it. He wanted to do it.

Besides me and my group of friends, Neil had little to no separation between his work and personal life. His colleagues were his friends—in and out of the office. The Congressman and his staff spent most of their time together—at work, traveling back to the Congressman's home district, and plenty of gatherings on weekends.

We were dating for six months before Neil told me the Congressman was one of his roommates. In fact, he lived with Bob for nearly four years. For two of those years, they shared a two-bedroom apartment along with the chief of staff at the time. I was surprised to learn that it was the Congressman who didn't have a bedroom and slept on the couch. Bob didn't want anyone to know he lived there and had asked Neil not to tell anyone.

I thought it was inappropriate that Bob lived with his staff and told Neil so. He explained that Bob was not a rich man, couldn't afford a house in Ohio and a house in Washington and that they were all friends. From Neil's first days in Washington, Bob was not only his boss and mentor; he was his friend and roommate. Neil learned everything from Bob and was fiercely loyal to him. You can imagine the thrill of being thrown into such a situation

and having a congressman's ear at such a young age. Neil took it seriously and wouldn't dream of disappointing Bob.

While Neil was working for Bob, the Congressman and his staff worked very late and played very hard. Neil came home after midnight on most weeknights and frequently he had been drinking with the Congressman and other staffers. On a few occasions, I'd meet them for a drink. I could see the college party-like atmosphere. It was hard for staffers to leave early or stop drinking. The Congressman wouldn't approve.

I didn't know Neil's colleagues or Bob very well in the beginning. Girlfriends and wives were kept at a distance from that world. I assumed that Bob didn't like anyone interfering with the 24-7 nature of the job. And because of my liberal-leaning political orientation, I liked it that way for the most part. Politics were always the topic of discussion and I disagreed with Bob on just about everything.

With Bob, everything was over the top. When he was angry, he was livid. Often, he would call Neil in a fury—and drunk—announcing that someone had wronged him or some staffer had done something egregious and needed to be fired. When Neil was Bob's chief of staff, I would overhear Neil on the phone late at night trying to reason with him, suggesting that he not make any decisions until the following morning. Neil's tenure in Bob's office was a rollercoaster of jubilant highs and dangerous lows powered in part by the Congressman's troubles with alcoholism.

Neil and I were married in July 2000. Neil's job was getting unbearable for both of us—too many late nights and Bob's demands took up too much of Neil's time and energy. After many discussions throughout our first year of marriage, we agreed that Neil would leave Bob's office and soon. We returned home from our delayed honeymoon on September 9, 2001 with plans for Neil to leave immediately. The tragedies that occurred on September 11th and the subsequent crises on Capitol Hill in the weeks and months that followed postponed our plans. As Chief of Staff for the Committee on House Administration, Neil took on an extraordinary amount of responsibility to ensure uninterrupted communications among Members of Congress. By all accounts, he did an outstanding job in the weeks that followed and worked tirelessly to ensure the safety of Members of Congress and their staff.

By February 2002, Neil finally left the Hill. The offer from Jack Abramoff was ideal. After all, Jack was known to be a family man. He worked hard but his priorities were a little more in line with ours—or so we thought.

Neil's new job working for Greenberg Traurig was, at first, perfect. He had a beautiful office overlooking Lafayette Park. While his paycheck was comparable to his Capitol Hill salary, if he worked hard, it had the potential to be a lucrative job. Personally, I was thrilled about this new opportunity for Neil. It meant that we would likely have more time to focus on our marriage and think about starting a family. We both thought this next move was in our best interest.

After he had worked a few months for Jack, I noticed that Neil had exchanged one unusually demanding job for another. The pressure was intense but different than his experience on the Hill. Neil's focus became making Jack's clients happy and assuring Jack that he had the ability to make money for the firm.

Despite the lavish trips and tickets, I never got the impression that Neil liked his lobbying job as much as his Hill job. It seemed fun. But it didn't have the sense of purpose that his experiences on the Hill did.

Nevertheless, Neil had a genuine affinity for Jack and was indebted to him for this exciting new opportunity. Jack would often ask about me and our plans for the future. Jack would tell Neil, in so many words, that he could have it all—a good job, a nice home and the ability to support a family.

It wasn't until the Washington Post reported, in February 2004, that Jack and Michael Scanlon had been defrauding their Indian tribe clients that Neil's eyes were truly opened and he began to come to grips with the pervasive corruption with which he had surrounded himself. But, eventually, Neil confronted the situation and began to figure out how to right his wrongs.

Neil decided that, no matter the price—financial and otherwise—he would do everything that was asked of him to tell the truth and make amends. No hedging. No excuses. Admittedly, I was scared and angry. I began to realize that Neil's poor judgment would cost us our savings, possibly our house, our reputation and perhaps our marriage. Neil eventually lost his lobbying job which destroyed his sense of self worth and purpose. He would spend hours upon hours meeting with the Justice Department and the FBI, each time coming home in utter disbelief that he had gotten us to this place. His remorse was paralyzing those first few months but his determination to do right was steadfast.

I believe Neil's relationship with Bob fundamentally changed one night in spring 2005 after an intense and dramatic confrontation. Neil had met Bob and some of his staff at a downtown restaurant for a late dinner. Around midnight, the phone rang and I answered. It was Bob. He was fuming and looking for Neil. When I told him Neil wasn't home, he started yelling, using plenty of profanities and making accusations. He called again and I didn't pick up the phone.

Neil was on his way home when I called to tell him what had happened. He told me that Bob had asked him questions about the investigation and when Neil refused to discuss it, Bob became enraged. Even though Neil sounded upset, he knew he had done the right thing by standing up to his long-time mentor and friend.

As our legal troubles have unfolded over the past three years, I have witnessed Neil's best and worst moments. I have watched him come to grips with his poor judgment and begin anew.

Without exaggeration, Neil has spent the better part of the past two and a half years in isolation. While we have enjoyed the support of our friends and family, it's a much smaller circle than it used to be.

Besides a couple of small consulting projects for friends, Neil was unemployed for more than a year. He applied for hundreds of jobs and attended numerous job fairs. He completed a month's worth of training for one job only to find out that the company's legal counsel wouldn't agree to hire him. He would sometimes substitute teach at the pre-school in our neighborhood where a friend is a teacher. Neil loves children and they lifted his spirits.

Finally, he got a job selling windows and siding in Northern Virginia. But when U.S. Vets, the organization for which he had been volunteering for nearly a year, asked him to join their staff, he jumped at the chance. It was good, important work for a cause about which he cares deeply. The money wasn't great but the job was solid, reputable and gave Neil a new direction and sense of purpose.

Following his guilty plea, Neil has turned inward and remained rather stoic. He has different priorities now. He prefers home to a fancy restaurant and takes comfort working around the house.

Neil has faced his family and his friends and has apologized to us all profusely. He works daily to regain my trust and faith. More importantly, he has come to terms with his bad decisions and forgiven himself. Now, each day is a new one as he begins a major life transformation.

At a relatively early age professionally, Neil has had to confront issues that he never imagined would become his failings—including his naiveté, gullibility, unquestioned loyalty and ego. Despite his failures and bad decisions, Neil is a deep, kind, generous man. He has re-committed himself to his family, my family, his friends and the residents at Ignatia House, the U.S. Vets' facility for homeless veterans. He spends his weekends collecting donations at a local farmers' market for the veterans and coaching our neighborhood youth soccer team.

Neil has always had a keen interest in those around him, but he now has a new sense of humility, understanding and kindness. His best days are when a homeless veteran moves into the Ignatia House and spends his first night off the streets. His worst are ones when he is haunted by what he's done, how it has affected our marriage, those around him and his recognition that he should have handled things so much differently.

Your honor, as you contemplate Neil's sentence for his past wrongdoings, I ask that you please consider the man Neil is today. This experience, despite its difficulties, has been a transformative one. Neil owns his mistakes fully and earnestly. And he is forever changed because of them.

Our plans and dreams have changed as they have been indefinitely postponed. Please show him leniency so that we can move on with our lives together while Neil continues to live with his mistakes and works to make his life a more meaningful one.

Thank you.

Sincerely,

Alison Betty Volz

# EXHIBIT 3

August 15, 2007

The Honorable Judge Ellen S. Huvelle, U.S.D.J.
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington DC 20001

Subject: Neil Volz

Dear Judge Huvelle:

Neil Volz is person I have known, respected and admired for many years. It is with
honor that I write this letter on his behalf, and sadness for its necessity.

In our 10 years of friendship, Neil has demonstrated intense loyalty, admirable dedication
to family and friends -- and a sense of integrity that far exceeds the norm of what I have
encountered in a long corporate career.

I met Neil through his wife, Alison, in their early courting years. While Neil was then a
young, aspiring press secretary of a Congressman, he was also a continuing student. As a
stand-out campaign volunteer, he had been plucked to join the Congressman before
finishing his college degree. Given that I was a graduate school student at Georgetown,
we spent a great deal of studying time together as he tackled the completion of his Ohio
State degree from afar. This was not an easy task; one that took great discipline and
devotion to his family's wish that he get his bachelor's degree despite his demanding job.
He did.

This legal experience has been very painful for Neil's family and friends – and most
significantly – him. Considered a pillar of moral strength and an intellectual powerhouse
by many, it was almost unimaginable to witness his situation unfold. In my interactions
with Neil during the past two years, I have seen the severe toll his sorrow and remorse
has taken on his physical and emotional state.

Neil comes from a deep-rooted, Midwestern value system that is grounded in hard work,
loyalty and integrity – doing the 'right' thing to 'achieve' and make something of one
self. Over the years, I would describe his career ascension as a true 'Horatio Alger'
story. And, like many of us, we take direction from authority to 'do a good job' – do our
best. Indeed, Neil has expressed and demonstrated sincere regret over his actions that
have crossed a line in this vein.

Without question, my experience with Neil in his realization of his mistake has shown me
that this is a man who has learned dearly from them. I can see a sincere hope in him that
he may have a chance of reversing those actions and contributing to the world in a pure,
constructive and altruistic way.

Your Honor, I plead with you today, in considering Neil's ruling, that his character is strong and his remorse, great. He is a good man who can make a significant contribution to the world.

Kind regards,

Colleen Aylward, M.P.P.
911 14th St
Santa Monica, CA 90403
310-465-7174

# EXHIBIT 4

Stacy E. Beck
5413 31st Street NW
Washington, DC 20015

July 18, 2007

The Honorable Judge Ellen S. Huvelle, U.S.D.J.
U.S. District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Huvelle:

I write on behalf of my friend, Neil Volz, whom I understand is scheduled to be sentenced on September 12, 2007.

I have known Neil for almost a decade, since he began dating my friend Alison Betty, who is now his wife. During this time, Neil has proven to be a kind, funny, caring, and loyal friend. He is wonderful with children, especially with my one-year-old son. I always enjoy spending time with Neil—debating public policy, playing board games, or just catching up.

In my experience, Neil is a generous person who cares a great deal about giving back to his community. In the time I have known him, he has raised money for Parkinson's Disease research, coached youth sports teams, and volunteered at a local veterans facility. I believe that the same good intentions that inspire his volunteer work are what led Neil to enter a career in public service. He clearly made some serious mistakes along the way, and he has acknowledged those mistakes—both in the courtroom and to his friends and family. I know that Neil is genuinely and deeply remorseful about his actions and is heartbroken about the pain he has caused his family.

I understand that Neil has provided testimony helpful to the government's case against other defendants. As a member of this Court, I would respectfully urge your Honor to consider the extent of his cooperation as you consider his sentence. I understand that Neil has done everything the government has requested, and, based on media reports, his cooperation seems to have played a critical role in the government's successful prosecution of several high-level public officials. I hope that these factors will weigh heavily in his favor at sentencing.

I urge your Honor's leniency as you consider Neil's sentence.

Respectfully,

Stacy E. Beck
U.S.D.C. Bar No. 480540

# EXHIBIT 5

*Alicia Lane Betty, Esq.*
*28 Aileen Drive*
*Madison, CT 06443*
*(203)-779-5334*

August 21, 2007

The Honorable Judge Ellen S. Huvelle, U.S.D.J.
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

RE: Neil Volz

Dear Judge Huvelle:

I am writing to you today regarding Neil Volz. He is my brother-in-law and I have known him for about 8 years. Neil is a good man. In my interactions with him over the years, he has been nothing but a warm, attentive, good-hearted person. Frankly, I was shocked when I learned of his troubles, as I did not believe that it was in his character to be involved in such a situation. True to his underlying virtue, he has accepted responsibility for his actions, is bravely facing the consequences and shows that he is remorseful for his misdeeds.

Neil is a generous person, whom I trust completely, with full knowledge of his involvement in the situation before you. An example of his generosity and goodness was very clear to me when he came to assist my husband and I in the hospital when our first son was fatally ill. Neil was a source of comfort to us at that time and his sensitivity shone through as he sat by our side when we needed it most. He leant us his shoulder and his heart throughout our time of grief. While many people shy away from dealing with intensely difficult situations such as ours, Neil stepped up to be close to us and help carry us through. We are forever grateful to him for that.

As a mother, I have to mention that the Neil's goodness of heart and soul shine through when he is with our children. He is a warm, loving uncle to my two sons and they delight in his company. I believe that you cannot mask your character and virtuosity to a child. A child's intuition is too strong. I've seen this by watching my children's interaction with many people and have witnessed their love for and attraction to Neil because of his goodness and strong character.

I respectfully request that you take my observations and beliefs into consideration when you consider a sentence for Neil. Thank you for this opportunity.

Sincerely,

Alicia Betty

EXHIBIT 6

**ELIO BETTY**
37 Otter Cove Drive
Old Saybrook, Ct. 06475

August 8, 2007

The Honorable Judge Ellen S. Huvelle, U.S.D.J.
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Judge Huvelle,

I am writing to you on behalf of Neil Volz. I am Neil's father-in-law. I first met Neil in the late 1990's, when he was dating my daughter, Alison. As a typical father, no one could meet my expectations for my daughter, so I scrutinized Neil closely during those years. He proved to be a young man who enjoyed politics, and became a student of the political system. The several positions he achieved in Congressman Ney's office gave him a broad understanding of Congress, and when he became the Chief of Staff for the Chairman of the House Administration Committee, he learned to satisfy the needs of all Congressional offices, while maintaining a strict code of ethics and decorum in the process.

During that time, I also learned how devoted he was to his family, and always was appreciative of the standards of decency his parents instilled in him. Over time, I realized to respect Neil's intellect, and his desire to make a difference in his life and the life of my daughter. When he asked her to marry him, I was quite confident that this marriage was an excellent choice for both of them.

Despite what has occurred while Neil was employed by Bob Ney, or Jack Abramoff, I know that Neil never intended to harm anyone, or to benefit financially through any of the actions of these men. I know he was concerned that he may have been caught up in the transgressions of Jack Abramoff, and as a result needed to confer with, and cooperate with the Department of Justice.

During the past two years, Neil has cooperated fully and, as a result, has not been able to move on with his life with my daughter. He has suffered terribly, and has taken full responsibility for his actions. He has done volunteer work with several organizations, but has not been able to further his career, or earn a decent living. He has been available to the Department of Justice totally— whenever asked—and has spent hundreds, if not thousands of hours performing any, and all, that was asked of him. It is time for Neil to be able to move on, and I hope you will give him that opportunity.

Sincerely,

Elio Betty

# EXHIBIT 7

August 20, 2007

The Honorable Judge Ellen S. Huvelle, U.S.D.J.
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Huvelle,

I am writing to ensure you are aware that Neil Volz, my brother-in-law, is one of the more kind and trustworthy people I have ever known. He has been agonized by this period in his life, due not only to the obvious pain it has caused those around him, but more importantly, because of the true remorse he feels over his actions. While he could easily blame those for whom he as worked or the culture surrounding them, he has consistently and fully taken responsibility for his actions. I feel this speaks to his strength of character and, above all, his desire to do the right thing and make amends.

Along these lines, as I'm sure you are aware, Neil put himself at considerable legal peril in cooperating early and fully with the investigation. I felt he was motivated to do this by his sense of duty and honor rather than self-preservation. Character is defined not only by our ability to hew to the straight and narrow but how we regain our footing when we diverge from the path. I have been impressed by Neil's ability to identify his wrongs, put his faith in the system about which he cares so deeply and cooperate without reservation.

I have known Neil for more than a decade. Over the years, I have had occasion to disagree with Neil on many issues (my family and I are life-long Democrats.) But throughout all of these discussions, his integrity and true love of this country and its political system has shown through.

On a more personal level, I can tell you that Neil's deep empathy for those in difficulty and compassion for those around him fully round out his humanity. My wife and I have experienced very trying circumstances with the grave illness of our infant son. Over an extended period, Neil was always there for us and his support and caring were instrumental in helping us through an impossible situation. His consistent concern and willingness to help were well beyond what would have been expected from even a close family member. I will personally never forget how able he was to feel and ameliorate a father's pain. This, among others, is the mark of a truly good man.

Among the many factors you must consider in your decision, I would ask that you look at the whole of this man and his actions before, during, and after his misdeeds in determining the appropriate penalty. Neil's divergence from the principles of honesty and good government which he holds so dear are, I'm convinced, anomalies that do not define him. His subsequent actions and remorse are much more instructive as to his true character.

Thank you for your consideration of my experience.

Sincerely,

Elio M. Betty

# EXHIBIT 8

July 23, 2007

The Honorable Judge Ellen S. Huvelle, U.S.D.J.
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Huvelle:

If you have a daughter, I believe you will relate to my careful observations of my daughter's husband, Neil Volz. A mother pays careful attention to the character qualities of her son-in-law.

I know that Neil Volz is a good man. He has never shown us any reason to doubt his integrity and loyalty.

When I first met Neil, my daughter was working as a congressional staffer for a Democratic Congresswoman. Neil was a bright and eager young man working for a newly-elected Republican member of Congress, Bob Ney. Ney had persuaded Neil to leave Ohio State University to come to Washington to work as his Press Secretary.

The different political affiliations caused them to examine their goals and to test each others views. We joined in many of those discussions/debates and made some careful judgments of our own. We were impressed by Neil's knowledge of history, patriotism and strength of character. Although they came from different backgrounds and political orientations, they both truly believed they could contribute in a meaningful way to government. They were thrilled to be working in Washington.

They were married in 2000 and Neil became a much loved member of our family.

Neil was given more and more responsibility as he became the Chief of Staff of the House Administration Committee, and at the age of 32 he was in a unique and dangerous position during the events of September 11, 2001. Putting himself last, he facilitated the evacuation of the Capitol building. He handled this responsibility with unique calm and humility.

I believe he has handled the subsequent events in like manner. He has been remorseful, as forthcoming to us as his legal situation would allow and has done everything in his power to cooperate with the investigation. Most important to me, he has been sensitive to the needs of his entire family.

I have full confidence that Neil has the strength of character to begin anew and that he and Alison can rebuild their lives which have been painfully interrupted. He has shown us a level of integrity that will serve them well.

Sincerely,

Judith Betty

EXHIBIT 9

July 2007

The Honorable Ellen Segal Huvelle, U.S.D.J.
United State District Court, District of Columbia
East Barrett Prettyman Courthouse
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Huvelle:

As the sister-in-law of Neil Volz, it is with great pleasure that I write today, serving as a character witness.

I have known Neil for over ten years. Over this time, I have seen emerge a new man. Some of this may be maturity. Some, simply getting to know him. Much may be experience.

Where once Neil was reserved and careful with his words, today he is forthcoming and candid. He exudes clarity. He is reflective. He is a realist. He does not try to conceal his humility or his honesty.

Today, he appears egoless. Discussions of what is important and what is not are woven into daily conversations. He is the first to admit his missteps. He does not deny mistakes made. And he has stressed, with emphasis, how sorry he is. That said, he remains a proud person. He laughs. He loves. And he continues to live, albeit within a new context, and by new rules.

One can't help but assume that his legal tribulations and commitment to helping federal officials have accelerated the above enlightenments, as well as those that follow:

Immediately following his plea (and subsequent dismissal from his firm), Neil seemed to explore new sides of himself. Always an avid reader, he set up a local book club and appeared to be reading even more. Always athletic, Neil signed on to help coach a neighborhood kid's soccer team. Always eager to discuss current events, he embraced global discussions about education, government, humanity, the economy, war, peace, and, of course, sports.

He seems to reflect daily. He makes exercise a priority. He handles many of the householding tasks, and enjoys cooking nightly. He takes his dog for long walks. He has started a garden. And he and his wife have taken on some impressive home-improvement projects together.

Most notably, Neil has put a lot of his time into his work managing a U.S. Soldiers' Home for homeless veterans in Washington, D.C.

The energy and commitment he displays for this job come across daily. He solves problems at both the organizational and the personal level. And the stories he shares reveal that his work affects him deeply. These men and women rely on Neil for leadership and daily reassurance that obstacles can be overcome and second chances are precious opportunities.

To conclude, Neil harbors no anger, much remorse, and more optimism than perhaps I expected. He is kind to himself, compassionate toward his wife, communicative with his family and friends, and, as always, generous toward strangers. None of this is new. It's only amplified under the careful scrutiny that exercises such as this initiate.

I hope you will find these words helpful. While I can't comment on the details that have lead Neil to this point, I can advocate for his integrity today, which I find to be exemplary, genuine, and rare.

Sincerely,

Lisa Betty
Gaithersburg, Maryland

cc: Neil Gregory Volz

EXHIBIT 10

4522 Warren St, N.W.
Washington, D.C. 20016
August 2, 2007

The Honorable Judge Ellen S. Huvelle, U.S. D.J.

United States District Court for the District of Columbia

333 Constitution Avenue, N.W.

Washington, DC. 20001

Your Honor,

I have known Neil Volz for about five years, from the time he and his wife, Alison, moved in next door to my daughter and son-in-law. We have met on many occasions and he and his wife have been welcome in my home several times.

During the past five years, Mr. Volz has been the best of neighbors to my daughter and son-in-law; he has looked after their house, fed their pets when they have been on vacation, even taken their children to school on occasions. I have been particularly struck by the fact that he has been assistant coach to my grandson's soccer team, even though

he and his wife do not as yet have children, and I have personally seen the good rapport he has with the players and their families. I am impressed that his sense of community spirit has led him to give up his Saturday mornings in order to coach very lively eight and nine-year old boys.

Mr Volz has always struck me as being very helpful and a good person to call on in an emergency – in fact, the kind of person anyone would be fortunate to have as a neighbor.

I believe that in these past months he has taken responsibility for his actions and that his innate seriousness and integrity have led him to regret the actions he took.

I have lived in the District of Columbia since 1970. If necessary, I can be reached at 202- 966- 9051.

Yours truly,

Inga C. Blest

EXHIBIT 11



A COLLABORATION FOR HOMELESS VETERANS

*United States Veterans Initiative*
*HONORARY BOARD OF DIRECTORS*
*President Jimmy Carter*
*Sidney Poitier*
*Oliver Stone*
*Dennis Franz*

*IN MEMORIAM*
*President Gerald Ford*
*Gregory Peck*
*Jimmy Stewart*
*Martha Raye*
*Jack Lemmon*

*NATIONAL*
*ADVISORY BOARD*
*Heather French Henry*
*Gus Hein*
*Tony Orlando*

July 30, 2007

The Honorable Judge Ellen S. Huvelle, U.S.D.J.
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

To The Honorable Judge Ellen S. Huvelle:

I have been the direct supervisor for Neil Volz since his employment began with United States Veterans Initiative-USVI in June 2007 however he has been working with the site since October 2006 as a volunteer. I know him to be one of the organization's strongest leaders. He demonstrates strong work ethic, sound decision-making ability, and also the personality needed to assist the veterans that we serve at USVI. The veterans and all those who work with him can attest that he is personable and trustworthy. People want to be around him because he is not only a case manager. He takes the time to mentor his co-worker, AmeriCorp Members, veterans and others around him. His caring nature and sincere investment in everything he does also help him excel in working with the homeless veteran population we serve.

Through working with the veterans the nine months Neil is a living example of one of the organization's strongest valve, second chances. Neil belief that he has been given a chance has proven to be one of the largest assets in his ability to work with the veterans. Many of the veterans come to us without a sense of hope, self respect and many for one reasons or another also can no longer do the career they have done their whole life. Through watching and working with Neil the veterans get to see second chances for themselves not just hear about it. They have also learned that change can be good. However, I truly feel that as much as Neil has given to the veterans and the site he has gained more. When he talks about the veterans to others, one is able to truly see how working with this group of veterans has impacted his life.

Sincerely,

*Stephanie Buckley*

Stephanie C. Buckley, MS
Regional Director
United States Veterans Initiative

A collaboration for homeless veterans between
United States Veterans Initiative, a 501(c)(3) non-profit &
Cloudbreak Development LLC, a special needs housing corporation

733 S. Hindry Ave.
Inglewood, California 90301
(310)348-7600
www.usvetsinc.org

# EXHIBIT 12



A COLLABORATION FOR HOMELESS VETERANS

*United States Veterans Initiative*
*HONORARY BOARD OF DIRECTORS*
*President Jimmy Carter*
*Sidney Poitier*
*Oliver Stone*
*Dennis Franz*

*IN MEMORIAM*
*President Gerald Ford*
*Gregory Peck*
*Jimmy Stewart*
*Martha Raye*
*Jack Lemmon*

*NATIONAL*
*ADVISORY BOARD*
*Heather French Henry*
*Gus Hein*
*Tony Orlando*

The Honorable Judge Ellen S. Huvelle, U.S.D.J.
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Your Honor,

I am writing in support of my colleague and friend Neil Volz, who has been a huge asset to our organization, United States Veterans Initiative, as a volunteer and now as full time staff. Mr. Volz began volunteering with U.S. VETS in October of 2006 to assist with the successful reintegration of homeless veterans as a job search mentor one day a week. At the time he was very forthcoming about his situation and spoke of volunteering as a way to redirect his priorities in life towards giving back. He came faithfully as a volunteer and showed patience, open mindedness, and strong initiative.

From the start of Mr. Volz's service with us it was really clear how strongly motivated he was to be of help to the homeless veterans we serve. In addition to meeting with individual veterans and helping them with computer skills, resumes, and personal presentation, he soon started to assist us with fundraising and community relations. All the vets and staff really enjoyed having him around and he provided much needed support to individual vets and the organization as a whole. In December of 2006 Mr. Volz became the first member of and helped us to develop an Advisory Board for U.S. VETS – D.C.

When we had 2 key staff members move on in May of 2007 we brought Mr. Volz on as full time staff based on the performance and commitment he showed as a volunteer. He has developed an excellent rapport with the veterans and helps them daily to move forward in their reintegration goals. He has made possible new events and initiatives, including an upcoming golf tournament and new classes and programs for the vets we serve that we could not have had without him. Additionally, he is able to work so well with the veterans because, although he has extraordinary professional skills, he remains humble and takes an attitude of always being ready to learn and to listen.

In my opinion, Mr. Volz has made himself indispensable to the work we do in D.C. by his consistent devotion to our program and the veterans. It is my hope that he will be treated leniently by this court in light of his character, his dedication to public service, and our organization's need for his skills in the work we do.

Sincerely,

Emily Button

Emily Button
AmeriCorps Program Director
U.S. VETS – D.C.

A collaboration for homeless veterans between
United States Veterans Initiative, a 501(c)(3) non-profit &
Cloudbreak Development LLC, a special needs housing corporation

P.O. Box 1312 AFRH 3700 North Capitol St. NW
Washington D.C. 20011
(202) 545-1660
www.usvetsinc.org

EXHIBIT 13

July 26, 2007

John T. Cook
3668 Summer Hill Dr.
Carson City, NV 89705

The Honorable Judge Ellen S. Huvelle, U.S.D.J.
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Honorable Judge Huvelle,

I am writing this letter to attest to the character and remorse of Mr. Neil Volz. I have known Neil since 1991. We met our sophomore year at The Ohio State University and shortly after became roommates for the remainder of our three years there.

My family is from the Appalachion Midwest. They rarely traveled outside the twenty mile radius of our rural Ohio horse farm. My Father taught me a great deal but nothing of the "workings" of Capitol Hill. Instead he tutored me in the measure of a man and the deal made with a handshake. Those things have gotten me to where I am today and I don't pretend to be more than that.

I've seen the Capitol Hill side of Neil over the years; enthusiastic, idealistic and wide-eyed, but I know better the Neil who is compassionate, hopeful and open-minded. Neil is someone with strong convictions although never too aloof to truly listen to another's arguments. He is one who would often place Washington DC on hold to spend time with his father ailing from Parkinson's disease.

When Neil told me what little he could of his situation I, of course, was defensive. I was actually outraged and predictably felt he had been "scapegoated". I waited for Neil to fuel this fire of mine. However, I won't forget how he looked me in the eyes and solemnly told me of his responsibility in this matter and his obligation to himself to work with the authorities. Unyielding I reiterated my support for him and his career but it was more apparent that his career on Capitol Hill was not the issue. His concerns were those of his family. Would Alison, his wife, have the stamina to endure this by his side? How would his mother and brother fair? They both are teachers at the high school from which he graduated. What could he do to make this right with his father, and soon?

To this day, Neil does not speak of the career he had. He simply found work to support his household. More often he is likely to discuss my small construction business. He has spent countless hours supporting me. He has helped me with marketing, worked on my website, outlined an "Op-Ed" article for my small-town newspaper to give me some exposure and sent me endless information on the "Green Building Industry" which is a new focus of mine. He has done all of this after hours and pro bono.

Neil is a true friend, a loving husband, caring son and a remorseful man. He sees with new eyes the impact of his actions. I implore you to take these things into consideration and accept the opinion of a simple carpenter who is proud to call Neil Volz his friend.

Sincerely,

John Thomas Cook

EXHIBIT 14

August 6, 2007

The Honorable Judge Ellen S. Huvelle, U.S.D.J.
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Re:  Neil Volz

Dear Judge Huvelle:

I write on behalf of my friend Neil Volz to provide you with additional information about
him that, I hope, will be of some use to you as you make your sentencing decision.

I have known Neil and his wife Alison for about six years.  We are neighbors who met
initially in the dog park when our dogs were puppies.  I bonded with both of them
immediately, and we have become close friends over the years.

The most important insight I can give you about Neil is the way he has reacted to his
criminal charge and his guilty plea.  Not once has Neil expressed any emotion but shame
and remorse about his actions.  Not once has he blamed "the system" or whined,
"everyone does it."  He has told me that some old friends on the Hill, if they do not cross
the street when they see him, pat him on the back and say how unfair it is that he has
been singled out.  While recognizing that they mean well, Neil tells them no, he is
responsible for his actions.  He was wrong.

I know that his sentiments in this regard are real, because he has acted on them.  I now
teach a course to first-year midshipmen – "plebes" -- at the United States Naval
Academy.  The course is "American Government and Constitutional Development."  In
the fall of 2006, I asked Neil to come to the Academy to talk to my plebes about the mid-
term elections.  The course has a strong ethical component, and I asked Neil if he would
be willing to talk about his criminal conviction as a "cautionary tale" to the plebes.  He
did not hesitate.  While I ran it up the military chain – bringing a convicted felon to talk
to impressionable future Navy officers needed high-level approval – Neil spent hours
planning his presentation.  He outlined, we talked, and he outlined some more.  The
approvals came through, contingent on his talking candidly about his criminal conviction.
Neil was ready and very excited.  Though a bit nervous at the prospect of his first public
comments on the Abramoff matter, he was also anxious for this opportunity to do some
good from his wrongdoing.

About 200 plebes came to Neil's talk.  The political part was terrific, focusing on the nuts
and bolts of one race in Indiana.  But about ten minutes before the end of the class, Neil
paused.  He asked the midshipmen if they were wondering why a young person who

loves politics so much was not involved in a campaign. He told them, in a quiet, shaky voice, that he had made terrible mistakes. Because of those mistakes he had lost his job, was deeply in debt and had pleaded guilty to a felony. He was waiting for the judge to sentence him for his crime. The term "deafening silence" now has meaning for me. The students sat rapt while Neil told them very briefly about the criminal case. He then said that, in their lives, when they see that ethical or legal line up ahead, do not walk toward it. His parting message was to "walk away."

The other professors, military and civilian, told me that Neil's talk was one of the best presentations they had seen at the Academy, particularly in terms of the lasting impression they believe it will have on the midshipmen. Some of them discussed it later in their classes, as I did, and we all found it to be a very valuable teaching tool. Although disgusted by the scandal that Neil was part of, they greatly admired his courage in talking about it candidly to the midshipmen. Most important to Neil, a plebe came up to him after the event and said, "Thanks for coming. I appreciate people who stand up and take responsibility for their actions."

I know that Neil will continue, throughout his life, to find ways to use his mistakes to help others from making their own.

Thank you for considering my thoughts about my good friend.

Respectfully,

Vicki Divoll

3839 Livingston Street, NW
Washington, DC 20015
(202)288-4111 (cell)
vicki.divoll@gmail.com

2

# EXHIBIT 15

24 E Lakeside Avenue
Lakeside Park, KY 41017
August 12, 2007


The Honorable Judge Ellen S. Huvelle, U.S.D.J
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Huvelle:

I am writing this letter on the behalf of Neil Volz. My name is Shane Elkin and I am a childhood friend of Neil's. Presently, I am a mathematics teacher at a suburban junior high school, in Cincinnati, Ohio.

Neil and I have been friends for a very long time and when he asked me to write this letter, I felt compelled to help Neil in anyway I could. Neil and I first became acquainted playing community athletics. It was through athletics that we learned about hard work and what it meant to be part of a team. Our friendship continued through high school as we enjoyed lifting weights together after school. We also shared a love for music and enjoyed many concerts together.

We continued spending time together during college. I would visit Neil at Ohio State and he would visit me at Thomas More College. It was only after college when Neil moved to Washington D.C. and I moved to Kentucky that we didn't keep in touch on a regular basis; however, I still consider Neil a good friend. Just last fall we made arrangements to meet and catch up.

As an educator and a coach I work with young people every day. Many young people make mistakes and these mistakes are opportunities for personal growth. Adults are no different; they also make mistakes. As an educator I believe people should be life long learners and use every experience as an opportunity to learn and grow. Neil is a good person from a great family that made a terrible mistake. While I understand the need to hold individuals accountable for their actions, I am asking you to show as much leniency as you can possibly give my friend. I appreciate you taking the time to read this letter. I hope my words have enabled you to see Neil in a different light.

Sincerely,

Shane Elkin

EXHIBIT 16

August 20, 2007

The Honorable Judge Ellen S. Huvelle, U.S.D.J.
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Huvelle:

On September 12 Neil Volz will appear before you for sentencing. As you consider the
severity of his sentence I would like to offer some insight into Neil as a person.

I have known Neil for more than ten years, since he began dating and later married
Alison, a dear friend of mine. Alison and I have a long working relationship and personal
friendship, and I have always trusted her instincts about people. As I witness how Neil
has dealt with the personal impact of his legal issues, including the loss of his livelihood
and chosen profession, and yet manages to move on with life in a positive and
constructive manner, I am impressed now more than ever with Alison's selection of a life
partner.

There are two specific observations that lead me to believe that Neil is deserving of your
special consideration. First, I have been impressed with Neil's complete willingness to
cooperate with prosecutors in his case and accept responsibility for the role he played. I
have spoken with him as the case has unfolded and he has never made excuses or
suggested that he was in some way unfairly entwined in the case. In fact, his attitude
portrayed just the opposite mindset, always acknowledging responsibility and a desire to
make amends. I believe this demonstrates the remorse he truly feels for his actions.

While acknowledging the error of his earlier decisions, since his indictment and
conviction, Neil has had new choices to make. His decision first to volunteer and then to
work full-time with disadvantaged veterans suggests to me that he is truly interested in
making a positive and constructive contribution to society.

I believe Neil has demonstrated sincere regret for the harm he has caused and is ready to
accept punishment for his actions. As you determine the severity of his sentence, I
respectfully ask that you bear in mind the many ways Neil has revealed his true character
to his many friends and family members while confronting his mistakes. I believe he is
deserving of your leniency.

Sincerely,

Paul Frick
2911 29th Street, NW
Washington, DC  20008

EXHIBIT 17

August 8, 2007

The Honorable Judge Ellen S. Huvelle, U.S.D.J.
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington DC 20001

Subject: Neil Volz

Dear Judge Huvelle:

It is with great regret that I write this character reference for Neil Volz as needing to defend Neil's character should not be something one must do.

Neil and I met through a mutual friend in 1994. It was through this mutual friend that Neil also met his wife, Alison. I was one of Alison's roommates, when they began to date, so I was in a position to "really get to know" Neil. He and I have shared some of the most intense laughs and also heart warming conversations.

While living in DC, I was the friend that was part of the "private sector" so I was never really part of the "Hill" experience. However, from afar, Neil's business practices were the same as my other friends in similar positions; hence the reason that I had such a hard time understanding what he did wrong. Once he was in a position to do so, Neil was the one to explain to me his mistakes and express his regrets.

Neil is painfully aware of the burden that his friends, family and most importantly his wife have incurred. Last year Neil and I planned a small surprise birthday party for Alison. During the long distance planning process, I heard Neil laugh for the first time in too many months. The laugh was an expression of true delight in knowing that he was able to surprise Alison with her closest friends in one room. He was finally able to give her the support that she had been providing him since this situation commenced.

Neil is a wonderful man that made a terrible mistake. He has suffered greatly for his actions and has expressed that he would give anything to turn back the hands of time.

Warm Regards.

Lisa Garfinkel
20 West 72nd Street, Apt 408
NY, NY 10023
212-496-1363

# EXHIBIT 18

August 6, 2007

The Honorable Judge Ellen S. Huvelle, U.S.D.J.
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Huvelle,

We are writing you today to let you know a bit more about our good friend, Neil Volz. We met
Neil more than a decade ago, right around the time he started dating his wife, Alison. (Alison and
Maureen are sorority sisters, long-time housemates and bridesmaids in each other's weddings.)

The four of us spent a lot of time together over the years and grew quite close. Whether it was
preparing meals in the group house, going out to dinner or a party, or taking the occasional
weekend trip, we got to know them very well.

During that time, we watched Neil's career progress with admiration: congressional chief of staff
in his late twenties, committee staff director in his early thirties and then influential lobbyist.
Thousands of young people move to Washington each year with similar aspirations, but only a
handful move up the ladder so fast and most never achieve Neil's level of success.

Despite his meteoric rise, he remained the same old Neil: outgoing, kind, funny and self
deprecating. Everyone who knows Neil likes him. He's close to his family and loyal to his
friends. He keeps in regular contact with his high school and college buddies. Neil is a good,
genuine Midwestern guy.

As Neil's friend, it's been hard to watch his career, which he worked very hard to build, unravel.
And it has been especially hard to watch his legal problems mount and the publicity surrounding
it. Many people in his shoes would feel bitter, mistreated or disillusioned. Many people would
point fingers at their so-called mentors who encouraged, perhaps demanded, illegal behavior.
Many people would withdraw from their friends and acquaintances.

But not Neil. We have been amazed at his ability to take responsibility for his actions, without a
hint of bitterness or self pity. He has never blamed anyone else. He has never stated that he's
being treated unfairly. He has approached this entire situation with grace and optimism. He seems
to be anxious to pay his dues and move on with his life.

We hope this letter helps shed just a little light on Neil Volz. He is a good and decent guy, and we
are lucky to have him as our friend.

Thank you for your consideration.

Sincerely yours,

Maureen and Greg Hamilton
1319 N. Greenbrier Street
Arlington, VA 22205

# EXHIBIT 19



*The*
# Health
## Foundation
*of Greater Cincinnati*

July 27, 2007

The Honorable Judge Ellen S. Huvelle, U.S.D.J.
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

Your Honor,

I am writing to you on behalf of Neil Volz, a young man I have known since he was 11 years old. We have watched Neil grow up. His mother and my wife Donna taught together for over 20 years. We were invited to attend Neil's wedding to Alison.

We admired Neil for his intellect, his humor, and his concern for others. In his high school years, Neil was always the first to reach out to others and display a caring attitude toward his friends and family. He remains very close to his parents and his brother and his family here in Cincinnati.

Several years ago, we traveled to Washington, DC with our grandson, Justin. Neil, who had worked half the night serving his congressman, met us the following morning and gave our grandson a real-life experience that he will never forget. Neil talked at Justin's level and showed him the Capitol in a way that made our government come alive. Justin really related to this involved young professional who worked hard to staff an office, represent the people in his district and do the people's work.

I was in Washington to receive Library of Congress recognition for the Bell System's long-time work with services to the blind in the early 1990s. Neil made a special effort to join me for a reception following the event. His caring interest made that occasion even more important for me.

Neil realizes that he must assume responsibility for what he has done. In his conversations with me in recent months, he expresses heart-felt remorse and accepts responsibility for what he has done. I understand that Neil has cooperated fully with those prosecuting all who were involved. That would not be easy for any of us.

We trust that you will judge him fairly and want you to know that we continue to support Neil fully.

Sincerely,

Donald E. Hoffman
President & CEO

Our mission is to improve the health of the people of the Cincinnati region.

Our vision is to be one of the healthiest regions in the country.

Rookwood Tower • 3805 Edwards Road, Suite 500 • Cincinnati, OH 45209-1948
phone: 513.458.6600 • toll-free: 888.310.4904 • fax: 513.458.6610
http://www.healthfoundation.org